## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

WILLIAM SHANKLIN,

     Plaintiff,

v.                                  Civil Action No.  3:07cv319

KENNETH RANDALL SEALS, et al.,

     Defendants.

### MEMORANDUM OPINION

Plaintiff William Shanklin, a Virginia prisoner proceeding *pro se*, filed a Complaint pursuant to 42 U.S.C. § 1983.[1] Shanklin alleges Defendants Kenneth Randall Seals, Brian Snyder, Steven Hatfield, Traci Brylewski, Jason K. Price, Mark D. Beavers, and Michael Folsom (collectively, "Defendants"), all affiliated with the Hampton Police Department, mistreated him during an interrogation in which Defendants sought information about a missing person.

---

[1] The statute provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

Specifically, Shanklin alleges Defendants violated his First,[2] Fourth,[3] Fifth,[4] Sixth,[5] Eighth,[6] and Fourteenth Amendment[7] rights. Defendants filed a Motion to Dismiss for Failure to State a Cause of Action ("Motion to Dismiss") (Docket No. 58), providing Shanklin with appropriate *Roseboro*[8] notice (Docket No. 60). Shanklin has responded (Docket No. 73), and the matter is ripe for disposition. For the reasons that follow, the Court will GRANT IN PART and DENY IN PART Defendants' Motion to Dismiss. (Docket No. 58.)

## I. Motion to Dismiss Standard

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (*citing* 5A Wright & Miller, *Federal Practice and Procedure* § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations

---

[2] "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I.

[3] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.

[4] "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V.

[5] "In all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

[6] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[7] "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

[8] *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Martin*, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)) ("*Twombly*"). In *Twombly*, the Supreme Court noted that the complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* (citation omitted), to one that is "plausible on its face," *id.* at 570, rather than "conceivable." *Id.* In order for a claim or complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (*citing Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002); *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

A court determines plausibility by undertaking a "context-specific task" drawing on "judicial experience and common sense." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). In doing so, a court may evaluate which allegations are "entitled to the assumption of truth" because they are supported by factual allegations, and which allegations should be treated as legal conclusions. *Id.* at 1950. Only after distinguishing the well-pleaded facts from legal conclusions may the Court determine which factual allegations support a "plausible claim for relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

3

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.

Finally, while the Court liberally construes *pro se* complaints, *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), it does not act as the inmate's advocate, *sua sponte* developing statutory and constitutional claims the inmate failed to clearly raise on the face of his complaint. *See Brock v. Carroll*, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring); *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985); *Bracey v. Buchanan*, 55 F. Supp. 2d 416, 421 (E.D. Va. 1999).

## II. Factual Background

Shanklin places before the Court a lengthy narrative, 148 of 168 paragraphs of which describe his interrogation as conducted by officers from the Hampton Police Department. The Court notes, however, that despite the length of the Complaint, and the detail with which he describes Defendants' alleged violations,[9] Shanklin has omitted nearly entirely any discussion of the underlying reason for which he was interrogated.[10] Nor has he alleged any facts relating to the crime, if any, for which he was eventually arrested and convicted. As a result, the Court has before it no record pertaining to this information. Viewed in the light most favorable to Shanklin, the facts follow.

---

[9] The Court also notes that "Defendants strongly disagree with the accuracy and characterization of events alleged in plaintiff's complaint." (Defs. Mem. Law Supp. Mot. Dismiss ("Defs. Mem."), at 3.) (Docket No. 59.)

[10] Two paragraphs and some of the exhibits attached to Shanklin's Complaint suggest the interrogation centered on a possible murder and inquiry into the location of the victim's body. (Compl. ¶¶ 48, 76; Compl. Ex. C, Case Supp'l Report.)

4

## A.    Events of July 14, 2005

On July 14, 2005, Shanklin was taken[11] to the Hampton Police Department for questioning. (Compl. ¶ 13.) Upon arrival, the police placed Shanklin in a very small interrogation room and closed and locked the door from the outside. (Compl. ¶ 14.) "The interrogation room had no windows, no circulating [air], [and] a higher than a standard room or office temperature causing . . . Shanklin to sweat perfusively [sic]." (Compl. ¶ 15.) Shanklin began having breathing problems and knocked on the door for assistance. (Compl. ¶¶ 16-17.) Defendant Price brought Shanklin a cup of water and opened the interrogation room door. (Compl. ¶ 18.)

After a short while, Price closed the interrogation room door and questioned Shanklin. (Compl. ¶ 19.) Shanklin informed Price he feared for his safety and felt uncomfortable with Price and with the interrogation room door closed. (Compl. ¶ 20.) Price informed Shanklin he could leave at any time, but upon Shanklin's attempt to leave, Price told him, "'You better sit your ass down if you know whats [sic] best for you.' Their [sic] are 30 detectives in the next room over who would love to make sure you . . . stay put . . . ." (Compl. ¶¶ 21-23.) Shanklin told Price that if he couldn't leave the police station, he wished to call an attorney. (Compl. ¶ 26.) Price left the room, locking the door behind himself. (Compl. ¶ 27.) Price and Defendant Snyder reentered the interrogation room, closing the door behind themselves and denying Shanklin's request to leave it open. (Compl. ¶¶ 28-29.)

---

[11] Exhibit A to Shanklin's Complaint appears to suggest Shanklin was "voluntarily in [the] room" for questioning. (Compl. Ex. A, Interview Activity Log.)

Defendant Hatfield next entered the room, and Shanklin again requested that the door remain open. (Compl. ¶¶ 30-31.) Hatfield denied the request and closed the door, also denying Shanklin's request for cold water. (Compl. ¶¶ 31-32.) Shanklin then requested that Hatfield provide sleeping materials such as a mattress, pillow, or sheet and move him to a room where Shanklin might be able to sleep. (Compl. ¶¶ 33-34.) Hatfield denied the requests. (Compl. ¶¶ 33-34.) Finally, Shanklin requested permission to use the restroom, and Hatfield granted the request and handcuffed Shanklin before escorting him to the restroom. (Compl. ¶ 35.)

Defendant Snyder joined Hatfield as Hatfield escorted Shanklin back to the interrogation room from the restroom. (Compl. ¶ 36.) Shanklin asked Snyder to move him to a different interrogation room, and Snyder refused. (Compl. ¶ 37.) Shanklin then advised Snyder that he wished to call an attorney. (Compl. ¶ 38.) Snyder left the interrogation room, closing and locking the door behind him. (Compl. ¶ 38.) Shanklin tried unsuccessfully to open the door, then knocked loudly, to no response. (Compl. ¶ 39.)

Hatfield reentered the room, and Shanklin advised Hatfield that he would "inform everyone" that Defendants had locked in him the room. (Compl. ¶ 40.) Shanklin further informed Hatfield that he planned to sue the Hampton Police Department over the treatment he was receiving. (Compl. ¶ 41.) Shanklin again requested a drink, and Hatfield retrieved a can of soda for him. (Compl. ¶ 41.) Shanklin refused to speak further with Hatfield. (Compl. ¶¶ 42-43.) Shanklin again requested an attorney, and Hatfield told him "not right now." (Compl. ¶ 46.) Hatfield then brought Shanklin "room temperature chicken which appeared to have been left out for a long while." (Compl. ¶ 47.)

Snyder then reentered the room and began questioning Shanklin, alleging that the police had found evidence in Shanklin's home.[12] (Compl. ¶ 48.) Snyder told Shanklin he had to tell the police what they wanted to know or Snyder "would see to it plaintiff [sic] relative never see the light of day ever again." (Compl. ¶ 48.) Snyder told Shanklin that "if plaintiff knew what was best plaintiff would take a ride with him to show him what he wanted." (Compl. ¶ 51.) Snyder then left the room again, locking the door behind himself. (Compl. ¶ 52.)

Snyder then reentered the room and told Shanklin they were going for a ride. (Compl. ¶ 53.) Snyder placed leg shackles and handcuffs on Shanklin. (Compl. ¶¶ 54-55.) Shanklin complained that the leg irons and handcuffs were too tight, but Snyder did not loosen them. (Compl. ¶ 55.) Snyder then told Shanklin "he hated plaintiff [sic] type" and spit in Shanklin's face. (Compl. ¶ 56.)

Shanklin refused to go anywhere with Snyder. (Compl. ¶¶ 58, 60.) Snyder forced Shanklin up by the arm, walked to another location in the station, and retrieved his gun in a threatening manner. (Compl. ¶¶ 60-61.) Snyder then walked Shanklin to an unmarked police car, where Hatfield sat in the driver's seat. (Compl. ¶¶ 62-63.) Shanklin repeated that he did not want to go anywhere and that he wanted a lawyer, but Snyder pushed Shanklin into the car. (Compl. ¶¶ 64-65.)

In the car, Snyder and Hatfield refused to place a seatbelt restraint on Shanklin, despite Shanklin's explicit request to do so. (Compl. ¶ 66.) Snyder began again to question Shanklin, and when Shanklin refused to answer, Snyder hit Shanklin on the arm with his notepad. (Compl. ¶ 67.)

---

[12] Shanklin fails to state what alleged evidence Defendants claimed to have discovered.

When the car stopped, Snyder forced Shanklin out of the car, causing him to hit his ear and head against the car, lose his balance, and fall back inside the car.[13] (Compl. ¶ 70.) Snyder again grabbed Shanklin and pulled him out of the car, causing Shanklin "to hit the left temple forehead section of face causing plaintiff to have sharp pain in head feeling like he (plaintiff) blacked out for a second." (Compl. ¶ 70.) Shanklin alleges permanent injuries resulting from this incident, including "head aches and poor vison [sic] out of left eye." (Pl.'s Reply to Defs. Mot. Dismiss ("Pl.'s Opp'n"), at 15.) (Docket No. 73.)

## B.    Events of July 15, 2005

On July 15, 2005, back at the police station, Shanklin complained to Defendant Beavers that his restraints were too tight. (Compl. ¶¶ 72-73.) Beavers said Shanklin could go home only after he had spoken to Beavers. (Compl. ¶ 73.) Shanklin requested a lawyer. (Compl. ¶ 74.) Beavers took Shanklin to the same interrogation room and Shanklin again complained of the poor circulation and his back problems. (Compl. ¶ 75.) Beavers questioned Shanklin, and when Shanklin refused to answer, "Beavers stated he would himself make sure plaintiff die [sic]," and that "he will make sure plaintiff [sic] mother dies in jail." (Compl. ¶ 76.) Beavers told Shanklin he would put the lethal injections in Shanklin's arm himself. (Compl. ¶ 76.) Shanklin requested Beavers provide him food, remove his restraints, and allow him to contact an attorney. (Compl. ¶¶ 78-80.) Beavers told Shanklin he wouldn't eat or rest until Shanklin told Beavers what he knew, but Shanklin refused to answer. (Compl. 78-80.) Beavers left the room and locked the door. (Compl. ¶ 80.)

---

[13] The purpose of this allegedly forced car ride is unclear. Shanklin appears to allege Defendants drove him past his home, "following behind a news media van," and then back to the police station. (Comp. ¶¶ 68-69.)

Beavers reentered the room and mentioned to Shanklin that Ms. Turner, who was being questioned about the same investigation, was sitting outside. (Compl. ¶ 83.) Shanklin asked why Turner was receiving special treatment. (Compl. ¶ 84.) Beavers told Shanklin he could go outside only after he had answered some questions, and Shanklin again requested an attorney. (Compl. ¶ 85.) Beavers left the room and locked the door. (Compl. ¶ 85.) Someone brought Shanklin a phone to call an attorney, but Shanklin was unable to contact an attorney. (Compl. ¶ 86.)

Price then entered the room and told Shanklin that Turner was allowed to sit outside because she was cooperating. (Compl. ¶¶ 87-88.) Price showed Shanklin Turner's cellular phone. (Compl. ¶ 89.) Hatfield and Snyder then entered the room with Shanklin's mother, who was handcuffed and wearing leg restraints. (Compl. ¶ 90.) Shanklin's mother asked him to speak with the officers. (Compl. ¶ 93.) She began to cry, and Hatfield, Snyder, and Price laughed. (Compl. ¶ 94.) Defendants removed Shanklin's mother from the room, then told him to think about what he had seen. (Compl. ¶¶ 95-96.)

Shanklin again attempted to contact an attorney, but only reached the attorney's answering service. (Compl. ¶ 97.) Upon his next attempt, Shanklin reached his attorney, who told him not to speak with anyone about the case. (Compl. ¶ 98.)

Defendant Seals then entered the room, and Shanklin again asked that his restraints be removed because they were too tight and Shanklin suffered "circulation problems." (Compl. ¶¶ 100-101.) Seals refused to remove the restraints, nor did he move Shanklin to a different room or offer him anything to eat. (Compl. ¶¶ 102-103.) Seals insulted Shanklin, who continued

to refuse to speak without his attorney present. (Compl. ¶¶ 104, 106.) Seals left the room and locked the door. (Compl. ¶ 107.)

Seals again entered the room, announcing to Shanklin that his attorney had requested that Shanklin ride with Seals "to identify the person which plaintiff was being held for questioning at [the Hampton Police Department]." (Compl. ¶ 108.) Shanklin inquired as to his attorney's whereabouts and was told that the attorney would meet him later. (Compl. ¶¶ 109, 111.)

Seals walked Shanklin out to the front of the police station, refusing to remove his restraints even though Shanklin complained that he was in pain. (Compl. ¶ 112.) Shanklin again asked where his attorney was and was told the attorney would meet up with Shanklin shortly. (Compl. ¶ 113.) Seals placed Shanklin in a car driven by Defendant Brylewski. (Compl. ¶¶ 116-19.)

When the car stopped on Buckingham Drive, Shanklin asked where his attorney was. (Compl. ¶ 121.) Seals informed Shanklin that his attorney would meet up with him. (Compl. ¶ 121.) As the car passed a police road block, Shanklin "repeatedly asked for Attorney." (Compl. ¶¶ 123, 125.) The car stopped and Hatfield pulled Shanklin out. (Compl. ¶ 127.)

Seals, Hatfield, Brylewski, and an "Asian female officer" walked with Shanklin through a wooded area. (Compl. ¶¶ 128-130.) As he was walking, Shanklin dropped "a family cherished ink pen," which Brylewski retrieved but refused to return to him. (Compl. ¶¶ 135-39.) The parties returned to Brylewski's car,[14] and Shanklin again requested that one of the officers remove his restraints and permit him a shower, change of clothes, and sleep. (Compl. ¶ 140.)

---

[14] Shanklin conveniently omits any facts regarding the result of the ride "to identify the person which plaintiff was being held for questioning at [the Hampton Police Department]" (Compl. ¶ 108) or the walk in the woods (*see* Compl. ¶¶ 128-30).

Defendants refused. Back at the Hampton police station, "Officer R. Viney finally removed the over tightened no link hand cuffs" and stated that he would remove Shanklin's leg shackles in lock up. (Compl. ¶ 143.)

Shanklin's brother, James Shanklin, Jr., states that while Defendants interrogated Shanklin, Defendants simultaneously interrogated James in a closed interrogation room next door to Shanklin. (Pl.'s Opp'n Ex. 1, James Shanklin, Jr. Aff. ("James Shanklin, Jr. Aff.").) James "could hear [his brother] yelling very loudly in pain." (James Shanklin, Jr. Aff.) Following Shanklin's interrogation, James "noticed bruises on [Shanklin's] body," and by letter later that month, Shanklin informed James that "he was hit and threaten[ed] by the detectives." (James Shanklin, Jr. Aff.)

### C.   Events of July 16, 2005 & Defendant Folsom's Role

On July 16, 2005, Shanklin states that Snyder and a female officer performed "a nail scrape DNA test" on him. (Compl. ¶ 144.) During the test, Snyder taunted Shanklin. (Compl. ¶ 144.)

Between July 14 and 15, 2005, Defendant Folsom seized Shanklin's personal property, including Shanklin's "personal wallet with credit cards, drivers license social security card over $700.00 in cash pictures children social security cards and several employment identifacation [sic] cards and security access cards and alarm pass codes." (Compl. ¶ 145.) Folsom failed to inventory these items and left Shanklin's vehicle and home unlocked after seizing the items. (Compl. ¶¶ 145-46.) Shanklin's "home was broken into and invaded because of the actions of Defendant Folsom." (Compl. ¶ 146.)

### III. Claims for § 1983 Relief

Shanklin asserts nine claims arising from this interrogation:

Count One[15] (A)  "Forceful Departure and Transportation," in violation of Shanklin's Eighth and Fourteenth Amendment rights;

(B)  Deliberate indifference to Shanklin's health and safety by ignoring Shanklin's requests for a seat belt or to loosen his restraints;

Count Two  "Failure to Allow or Provide Access to Legal Counsel" during the course of Defendants' interview of him, in violation of Shanklin's First and Sixth Amendment rights;

Count Three  "Discriminatory Treatment" during Defendants' investigation, in violation of Shanklin's equal protection rights under the Fourteenth Amendment;

Count Four  (A)  "Unwarranted Seizure;" and,

(B)  "Confinement" in a police interrogation room for a period of two days, in violation of Shanklin's Fourth, Eighth, and Fourteenth Amendment rights;

Count Five  "Breach of Duty to Protect," resulting from Defendants' deliberate indifference to Shanklin's health and safety, in violation of Shanklin's Eighth and Fourteenth Amendment rights;

Count Six  "Unwarranted Seizure of Property," in violation of Shanklin's Fifth and Fourteenth Amendment rights;

Count Seven  "Totality of Each Combined Stated Fact;"

Count Eight  "Failure to Administer Adequate Remedy;" and,

Count Nine  "Retaliatory Treatment for Plaintiff's Refusal to Answer Questions or Cooperate," in violation of Shanklin's Fifth, Eighth, and Fourteenth Amendment rights; specifically,

---

[15] Count One also asserts an "[u]nwarrantable seizure of plaintiff" in violation of Shanklin's Fourth Amendment rights. Because this claim appears to assert a violation identical to Count Four, however, the Court will not repeat the discussion with respect to Count One.

12

(A) Defendants intimidated, harassed, and tortured Shanklin by physically restraining him at the wrists and ankles and confining him to a small interrogation room with no opportunity for sleep; and,

(B) Defendants "continually made mention of plaintiff's mother in a [sic] intimidating and assaulting way."

(Compl. ¶¶ 149-60.) Shanklin seeks a declaration that Defendants have violated his constitutional rights; "[a] preliminary and permanent injunction order[ing] defendants . . . to relinquish all authority vested by the state of Virginia to uphold law and order" (Compl. ¶ 162); "a full investigation into the actions, wrongdoings and misconduct" of Defendants (Compl. ¶ 163); compensatory damages in the amount of $100,000 against each defendant, and $200,000 against Defendant Seals (Compl. ¶ 165); punitive damages in the amount of $200,000 against each Defendant (Compl. ¶ 166); and, finally, costs and any other relief the Court deems appropriate (Compl. ¶¶ 167-68).

Defendants contend, *inter alia*, that Shanklin's claims must be dismissed pursuant to *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994), because Shanklin remains incarcerated due to a valid conviction.[16] (Defs. Mem. 7.) Defendants also contend that, should his

---

[16] Defendants also contend that the statute of limitations bars Shanklin's claims and that Shanklin has failed to exhaust his administrative remedies. (Defs. Mem. 14-17.) Each of these defenses fails.

First, Defendants' statute of limitations argument fails because "the pendency of a suit to enforce a right of action, however long protracted, suspends [the] effect [of the statute of limitations]." *Brunswick Land Corp. v. Perkinson*, 151 S.E. 138, 140 (Va. 1930); *see also Wilson v. Garcia*, 471 U.S. 261, 279-80 (1985) (adopting the state statute of limitations for personal injury actions in § 1983 actions); Va. Code § 8.01-243(A) (requiring an action for personal injuries to be brought within two years of the date of injury). Shanklin filed his initial Complaint on or about June 4, 2007. (Docket No. 1.) June 4, 2007 falls within two years of July 14, 2005, the date Shanklin alleges he first suffered mistreatment by the Hampton Police Department. Therefore, Shanklin's suit against Defendants was timely filed and pending as of June 4, 2007, thus tolling the statute of limitations.

claims survive *Heck*, Shanklin nevertheless fails to state a claim as to each count. (Defs. Mem. 8-14.)

## IV. Analysis

### A. *Heck v. Humphrey* Does Not Bar Shanklin's Claims

Defendants contend that the Supreme Court of the United States's holding in *Heck v. Humphrey*, 512 U.S. 477, 487 (1994), bars Shanklin's claims. Defendants assert that "[t]he crux of plaintiff's complaint attempts to challenge his conviction, as it merely outlines the events that led to his arrest and, ultimately, his conviction." (Defs. Mem. 7.)

In *Heck*, the Supreme Court stated that "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement." *Heck*, 512 U.S. at 486. The Supreme Court explained that if "a judgment in favor of the [§ 1983] plaintiff would necessarily imply the invalidity of his conviction or sentence," a § 1983 suit does not offer the appropriate vehicle for relief. *Id.* at 487. The Court held that:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or

Second, although the general principle had been that a § 1983 plaintiff need not exhaust administrative remedies before filing suit, § 1997e of the Prison Litigation Reform Act now requires all prisoners "seeking redress for prison circumstances or occurrences" to exhaust administratively their claims. *Porter v. Nussle*, 534 U.S. 516, 520, 523 (2002). However, prison circumstances encompasses "prison life, whether [that] involve[s] general circumstances or particular episodes." *Id.* at 532. Shanklin seeks redress not for violations resulting from his prison conditions, but for violations he alleges occurred prior to his incarceration. Therefore, § 1997e does not squarely govern the instant claims. Thus, the Court will address Shanklin's claims on the merits.

sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

*Heck*, 512 U.S. at 486-87 (internal footnote omitted).

But, if "the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the [§ 1983] action should be allowed to proceed, in the absence of some other bar to the suit." *Id.* at 487 (footnotes omitted); *see Wilkinson v. Dotson*, 544 U.S. 74, 79 (2005) (permitting action under § 1983 so long as it did not challenge the "'fact or duration of . . . confinement'" or pursue either "'immediate release from prison' or the 'shortening' of" a sentence (*quoting Preiser v. Rodriguez*, 411 U.S. 475, 482, 489 (1973)). By way of example, the Court noted that "a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction" because the doctrines of independent source, inevitable discovery, or harmless error may permit admission of evidence recovered from the search. *Heck*, 512 U.S. at 487 n.7.

Under *Heck*, a court must first ask whether plaintiff's claims necessarily imply the invalidity of his current sentence. *Id.* This "requires a close factual examination of the underlying conviction." *Riddick v. Lott*, No. 05-7882, 202 F. App'x 615, 616 (4th Cir. 2006), *available at* 2006 WL 2923905, at *1 (*citing Heck*, 512 U.S. at 487 n.7); *see Ballenger v. Owens*, 352 F.3d 842, 846-47 (4th Cir. 2003). The Court has before it a record entirely devoid of any information regarding Shanklin's underlying conviction. At best, the record indicates that the Hampton police interviewed Shanklin. (*See* Compl. Ex. C, Case Supp'l Report (stating that officers were interviewing Shanklin in the hopes that he would divulge "the location of the body

15

of Davion Mutts").) This presents an insufficient record from which to undertake a *Heck* analysis. Therefore, because the Court lacks a record sufficient to make a "close factual examination" of whether Shanklin's success on any of the claims alleged would necessarily imply the invalidity of his conviction, *Heck* does not bar these claims. *Riddick*, 202 F. App'x at 616.

## B.     Count One:  Forceful Departure and Transportation

Shanklin claims Defendants "forced [him] to unwillingly get into a [sic] unmarked police cruiser without a safety seat belt" despite his "unwillfulness [sic] to leave," violating his rights to due process and to be free from cruel and unusual punishment. (Compl. ¶ 149.)  Shanklin also contends that Defendants Hatfield and Snyder "excercised [sic] deliberate indifference to plaintiff's health and safety by ignoring plaintiff repeatedly requests [sic]" to place him in a seat belt and to loosen his restraints. (Compl. ¶ 149.)

### 1.     Count One (A) Survives Defendants' Motion to Dismiss

#### a.     The Eighth Amendment Does Not Apply to Shanklin's Claims

In any action pursuant to § 1983, the Court must first identify the contours of the underlying right said to have been violated. *Graham v. Connor*, 490 U.S. 386, 394 (1989).  This requires a determination of Shanklin's status at the time of the alleged violations. *United States v. Cobb*, 905 F.2d 784, 788 (4th Cir. 1990).  The conduct of which Shanklin complains clearly occurred prior to any conviction, as his Complaint is devoted to a discussion of Defendants' actions during an investigation.  Therefore, the Eighth Amendment prohibition against cruel and unusual punishment does not apply. *Graham*, 490 U.S. at 392 n.6 (*citing Ingraham v. Wright,*

430 U.S. 651, 671-72 n.40 (1977)) (stating that the Eighth Amendment applies after an adjudication of guilt).

### b. It Is Unclear Whether the Due Process Clause of the Fourteenth Amendment Governs Shanklin's Claims

Defendants presume Shanklin was a pretrial detainee. (*See* Defs. Mem. 8.) For pretrial detainees held prior to an adjudication of guilt, the Due Process Clause of the Fourteenth Amendment provides the proper constitutional lens through which to view allegations of cruel and unusual punishment. *Cobb*, 905 F.2d at 788; *Bell v. Wolfish*, 441 U.S. 520, 537 n.16 (1979) ("Due Process requires that a pretrial detainee not be punished."); *Ingraham,* 430 U.S. at 672 n.40 ("Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.").

"[T]he pretrial detainee, who has yet to be adjudicated guilty of any crime, may not be subjected to *any* form of 'punishment.'" *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) (*citing City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)); *Bell*, 441 U.S. at 537 n.16 ("Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment."). Thus, if Defendants held Shanklin as a pretrial detainee, he need only establish that Defendants' conduct was intended to punish him to establish a due process violation. *Cooper v. Dyke*, 814 F.2d 941, 948-49 (4th Cir. 1987).

Defendants argue that, as a pretrial detainee, Shanklin has failed to allege that Defendants took actions with the intent to punish him, and that Defendants' actions were rationally related to their investigation. (Defs. Mem. 8.) This argument may lie if Shanklin was indeed a pretrial

detainee. However, the Court cannot make such a finding on this record. Shanklin asserts only that he "was taken to the investigation bureau of the Hampton Police Department" for questioning. (Compl. ¶ 13.) He fails to clarify who took him to the police station or whether he was under arrest at the time.[17] *See Cobb*, 905 F.2d at 788 ("[Plaintiff], as one lawfully arrested and being held prior to a formal adjudication of guilt, was a pretrial detainee." (*citing Martin*, 849 F.2d at 865-66)). Even presuming Defendants held Shanklin in custody,[18] it is not clear to the Court whether a suspect in custody equates to a pretrial detainee, thus meriting similar analysis under the Due Process Clause.

Moreover, Defendants' notes, attached to Shanklin's Complaint as Exhibit A, appear to indicate that Shanklin voluntarily entered the interrogation room. (Compl. Ex. A, Interview Activity Log.) If "there had been no hearing to assess probable cause or set bail-indeed, no judicial determination that there was *any* basis for [Shanklin's] detention," Shanklin was never under arrest, and "no process was invoked, even deprivations of liberty that do not rise to the level of 'punishment' arguably suffice to establish a Fourteenth Amendment violation." *Cooper*, 814 F.2d at 949; *see also Westmoreland v. Brown*, 883 F. Supp. 67, 72 n.5 (E.D. Va. 1995) (discussing *Cooper*). Defendants have not clarified the record as to Shanklin's custody status.

---

[17] To the extent Shanklin claims any conduct constituted excessive force during an arrest, that claim would arise under the Fourth Amendment. *Cobb*, 905 F.2d at 788 n.7.

[18] At most, the Complaint alleges Defendants held Shanklin in custody. "A person is in custody if he has been formally arrested or if he is questioned under circumstances in which his freedom of action is curtailed of the degree associated with a formal arrest." *United States v. Bob*, 166 F.3d 1210 (4th Cir. 1998), *available at* 1998 WL 904738, at *3 (undergoing a Fifth Amendment *Miranda* analysis). The record does not speak to a formal arrest, but Shanklin alleges that he was questioned, placed in restraints, and told that he should not leave if he knew what was best for him. This may sufficiently establish circumstances similar to a formal arrest. *See id.*

18

Therefore, on this record, the Court cannot grant Defendants' motion with respect to Count One (A).[19] Accordingly, the Court will DENY Defendants' Motion to Dismiss as to Count One (A).

## 2. **Count One (B) Survives Defendants' Motion to Dismiss**

Shanklin's deliberate indifference claim appears to arise from Defendants' failure to restrain him with a seat belt and their failure to loosen his restraints despite his discomfort. Defendants' argument with respect to Count One (B) suffers the same defect as to their argument with respect to Count One (A): Defendants presume Shanklin was a pretrial detainee. (*See* Defs. Mem. 12 (discussing deliberate indifference to a pretrial detainee's claims with respect to Count Five).) The record before the Court insufficiently establishes whether Defendants held Shanklin as a pretrial detainee, and the key to determining the specific constitutional right allegedly infringed derives from a determination of Shanklin's status at the time of the alleged deprivation. *See Cobb*, 905 F.2d at 788. Therefore, because it lacks information to determine Shanklin's

---

[19] Furthermore, if Shanklin was not under arrest, and had voluntarily entered the interrogation room as a free citizen, the Fourth Amendment likely would control a claim of unlawful seizure resulting from Defendants forcing Shanklin into the unmarked police car. *See Unus v. Kane*, 565 F.3d 103, 119 (4th Cir. 2009) ("It has been consistently recognized that the Fourth Amendment protects a citizen's right to be free from unreasonable seizures."); *Riley v. Dorton*, 115 F.3d 1159, 1162 (4th Cir. 1997) (*citing Gerstein v. Pugh*, 420 U.S. 103 (1975) for the proposition "that the Fourth Amendment was the constitutional provision to use when evaluating questions of probable cause for arrest and detention"), *overruled on other grounds by Wilkins v. Gaddy*, 130 S. Ct. 1175 (2010); *Graham*, 490 U.S. at 388; *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person.").

The United States Court of Appeals for the Fourth Circuit has rejected the concept of a continuing seizure, however. *Robles v. Prince George's County, Md.*, 302 F.3d 262, 268 (4th Cir. 2002) (*citing Riley*, 115 F.3d at 1163)); *Riley*, 115 F.3d at 1164 (holding that "the Fourth Amendment does not embrace a theory of 'continuing seizure' and does not extend to the alleged mistreatment of arrestees or pretrial detainees in custody"). Thus, to the extent he alleges Defendants continued to hold him unlawfully, Shanklin's claims would be governed by the Fourteenth Amendment. *See* Part IV.E., *infra*.

status at the time of the alleged violations, the Court will DENY Defendants' Motion to Dismiss as to Count One (B).

## C.     Count Two:  Failure to Allow Access to Legal Counsel

Shanklin contends Defendants Hatfield, Snyder, Price, Beavers, Seals, and Brylewski denied him access to counsel despite his repeated requests to contact an attorney, in violation of his First and Sixth Amendment rights.[20]  (Compl. ¶ 150.)  Defendants contend that Exhibits A and C to Shanklin's Complaint undermine this claim.  (Defs. Mem. 10-11.)

Contrary to Defendants' contention, the Court cannot consider the content of the interview records simply because Shanklin attached them to the Complaint. *See Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806-07 (E.D. Va. 2007).  In order to be considered at this stage the records must be "integral to the complaint and authentic." *Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (*citing Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006)); *see also Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).  Under the first requirement, "the referenced document [must] be central or integral to the claim in the sense that its very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Walker*, 517 F. Supp. 2d at 806.  In *Walker*, the court refused to allow plaintiffs to utilize a newspaper article to fill holes in its complaint because the article "does not give rise to the causes of action alleged in the complaint, nor is it central or integral to those causes of action." *Id.*

---

[20] Shanklin alleges a First Amendment violation in the sense that he was prohibited from speaking with his attorney. (*See* Compl. ¶ 150.) This more squarely falls under a claim of denial of access to counsel. Therefore, the Court will not undertake a First Amendment analysis.

Exhibits A and C do not meet the first requirement of being integral to Shanklin's Complaint. Shanklin does not explicitly rely upon them in support of his claims, nor do the documents themselves give rise to any cause of action. Rather, Shanklin explains that he included exhibits with his Complaint to "assist during the reading of the facts as to a time frame." (Compl. App'x of Exs. 2.) In addition, Shanklin clearly disputes the authenticity of Exhibit C. (*See* Pl.'s Opp'n 4 (alleging that Exhibit C "has several fabrications").) Thus, Defendants may not rely on the exhibits to Shanklin's Complaint in support of their Motion to Dismiss Count Two. Therefore, the Court will DENY Defendants' Motion to Dismiss as to Count Two.

### D.     Count Three: Discriminatory Treatment in Violation of the Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir. 1995). To prove an equal protection violation, Shanklin must allege facts to prove that: (1) he and a comparator were treated differently and were similarly situated; and (2) that the different treatment was the result of discrimination. *See Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (citation omitted).

Shanklin alleges that Defendants treated a female police interviewee differently from him. Specifically, Shanklin alleges that the police permitted the female to remain unrestrained and to sit outside the investigation bureau, while Shanklin was restrained and denied permission to sit

sit outside the investigation bureau, while Shanklin was restrained and denied permission to sit outside. (Compl. ¶ 151.) Even taking as true Shanklin's statement that he and the female were in the police station for "questioning of a [sic] identical incident" (Compl. ¶ 151), Shanklin has alleged insufficient facts to find that Shanklin and the female were similarly situated. Moreover, Shanklin's claim must fail because he has failed to articulate any facts demonstrating that the unequal treatment resulted from his gender. *See Veney*, 293 F.3d at 730. Indeed, the record suggests they were treated differently based upon their levels of cooperation with the Hampton police. (*See* Compl. ¶¶ 87-88.) Accordingly, the Court will GRANT Defendant's motion as to Count Three. Count Three will be DISMISSED.

### E.    Count Four:  Unwarranted Seizure and Confinement

Count Four alleges Defendants unlawfully seized and confined Shanklin in a police interrogation room "for nearly two days refusing to allow plaintiff to be transfered [sic] to a proper area for sleeping, resting, and climate with adequate ventilation and space." (Compl. ¶ 152.) Shanklin contends this constituted deliberate indifference to Shanklin's health and safety, cruel and unusual punishment, and a violation of his due process rights.[21] (Compl. ¶ 152.)

### 1.    Count Four (A):  Unwarranted Seizure

"It has been consistently recognized that the Fourth Amendment protects a citizen's right to be free from unreasonable seizures." *Unus*, 565 F.3d at 119. Thus, the moments constituting

---

[21] Count One also alleges that Defendants improperly seized Shanklin in violation of the Fourth Amendment. (Compl. ¶ 149.) In support of this claim, Shanklin re-alleges paragraphs 1 through 147 of his Complaint. (Compl. ¶ 149.) The Court construes this claim as an allegation that Shanklin's seizure for interrogation purposes, and then his subsequent confinement to an interrogation room, violated the Fourth Amendment. (*See* Compl. ¶ 152 (re-alleging that Shanklin's confinement to an interrogation room violated the Fourth Amendment).)

Shanklin's initial confinement to the police interrogation room are governed by the Fourth Amendment. *See Wilkins v. May*, 872 F.2d 190, 192 (7th Cir. 1989) ("'Whenever an officer restrains the freedom of a person to walk away, he has seized that person' within the meaning of the Fourth Amendment." (*citing Garner*, 471 U.S. at 7)); *see Riley*, 115 F.3d at 1162. Defendants have made no argument as to the applicability of the Fourth Amendment, and the Court lacks the factual record necessary to undertake such an analysis. Accordingly, the Court will DENY Defendants' Motion to Dismiss as to Count Four (A).

### 2.     Count Four (B):  Unwarranted Confinement for a Two-Day Period

For the reasons explained above as to Count One (A), the Eighth Amendment does not apply to this claim. However, regardless of whether Shanklin had been arrested at the time of his confinement or remained a free citizen, the Due Process Clause of the Fourteenth Amendment governs this claim of continuing confinement because "this court has rejected any concept of a continuing seizure rule." *Robles*, 302 F.3d at 268 (*citing Riley*, 115 F.3d at 1163)); *Riley*, 115 F.3d at 1164 (holding that "the Fourth Amendment does not embrace a theory of 'continuing seizure' and does not extend to the alleged mistreatment of arrestees or pretrial detainees in custody"); *Wilkins*, 872 F.2d at 193-95 (rejecting the concept of a "continuing seizure" under the Fourth Amendment and finding that the Due Process Clause governs claims of persons in custody who have been arrested, but not yet charged).

Nevertheless, the Court must determine Shanklin's status before it can make a finding as to this claim. As explained with respect to Count One (A), if Defendants held Shanklin as a pretrial detainee, Shanklin must establish that Defendants' conduct was intended to punish him to establish a due process violation. *Cooper*, 814 F.2d at 948-49. However, if Shanklin

23

remained a free citizen at the time of his confinement in the interrogation room, the Due Process

Clause governs this claim, and "even deprivations of liberty that do not rise to the level of

'punishment' arguably suffice to establish a Fourteenth Amendment violation." *Cooper*, 814

F.2d at 949. Therefore, because it lacks sufficient facts to determine Shanklin's status at the time

of the alleged constitutional violation, the Court must DENY Defendants' motion as to Count

Four (B).

      **F.**    **Count Five: Breach of Duty to Protect**

      Count Five alleges Defendants failed to protect Shanklin "from the continued battery and

assault both physical and verbal from all named defendants," failed to adjust Shanklin's hand and

leg restraints, and failed to permit Shanklin to leave the interrogation room. (Compl. ¶¶ 153-54.)

Defendants again argue that the Due Process Clause of the Fourteenth Amendment governs this

claim. (Defs. Mem. 12.) Specifically, Defendants argue that Shanklin has failed to allege

Defendants actually knew of and disregarded a substantial risk of serious injury, and that

Shanklin has failed to state any facts showing that the handcuffs and shackles created a

substantial risk of serious injury to him. (Defs. Mem. 12.)

      Shanklin alleges Defendants each had an affirmative duty to protect him from the other

Defendants' alleged misconduct. "The affirmative duty to protect arises not from the State's

knowledge of the individual's predicament . . . but from the limitation which it has imposed on

his freedom to act on his own behalf." *DeShaney v. Winnebago County Dep't of Social Servs.*,

489 U.S. 189, 200 (1989). Thus, an affirmative duty to act arises from a custodial relationship.

*Id.*; *Doe v. S.C. Dep't of Social Servs.*, No. 08-2161, 2010 WL 746439, at *10 (4th Cir. Mar. 5,

2010) (holding "that when a state involuntarily removes a child from her home, thereby taking

the child into its custody and care, the state has taken an affirmative act to restrain the child's liberty, triggering the protections of the Due Process Clause"); *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir. 1995) ("This Court has consistently read *DeShaney* to require a custodial context before any affirmative duty can arise under the Due Process Clause."); *see also Piechowicz v. United States*, 885 F.2d 1207, 1215 (4th Cir. 1989) (holding that "Fifth Amendment substantive due process protects the liberty interests only of persons affirmatively restrained by the United States from acting on their own behalf").

In this case, the Court has determined that the factual record insufficiently establishes Shanklin's custody status during the time he spent at the Hampton Police Department. *See* Part IV.B.1.b & n.18, *supra*. Therefore, the Court will DENY Defendants' motion with respect to Count Five.

G.     **Count Six:  Unwarranted Seizure of Property**

Shanklin alleges Defendants Folsom and Brylewski "unproperly [sic] confiscated property from plaintiff for personal gain," resulting in a due process violation. (Compl. ¶ 156.) Shanklin alleges the items confiscated included his wallet, credit cards, driver's license, more than $700.00 in cash, pictures of his children, various employment identification cards and access badges, and " a cherished family handed down pen." (Compl. ¶ 156.) He contends Defendants still have possession of the confiscated items. (Pl.'s Opp'n 17.)

Defendants characterize this as a claim for substantive due process, and Plaintiff does not disagree. Defendants contend that to state a claim for a violation of substantive due process, Shanklin must "demonstrate (1) that [he] had property or a property interest; (2) that the state deprived [him] of this property or property interest; and (3) that the state's action falls so far

beyond the outer limits of legitimate governmental action that *no process* could cure the deficiency." *Sylvia Dev. Corp.*, 48 F.3d at 827 (*citing Love v. Pepersack*, 47 F.3d 120, 122 (4th Cir. 1995)). Courts narrowly construe the concept of substantive due process to "cover[] only state action which is 'so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies.'" *Id.* (*quoting Rucker v. Harford County*, 946 F.2d 278, 281 (4th Cir. 1991)).

Defendants assert that Count Six must fail because Shanklin cannot claim that Defendants' actions "were so unjustified by any circumstance." (Defs. Mem. 13 (*citing Sylvia Dev. Corp.*, 48 F.3d at 827).) Specifically, Defendants allege that the named items were seized after Shanklin was in police custody, and "[a] legitimate government interest exists in taking personal property from those individuals that are in police custody." (Defs. Mem. 13.) Presuming Shanklin was in custody pursuant to arrest, the Court agrees that Defendants' actions were not so unjustified by any circumstance and fell in line with a legitimate government interest. However, the Court already has noted that Shanklin's custody status requires factual elaboration so it cannot rest on that basis.

More on point, Shanklin has failed to show that he lacks "adequate rectification by any post-deprivation state remedies." *Sylvia Dev. Corp.*, 48 F.3d at 827 (*quoting Rucker*, 946 F.2d at 281). Virginia law permits a plaintiff to pursue "[a] proceeding in detinue to recover personal property unlawfully withheld." Va. Code § 8.01-114(A). Such a proceeding affords Shanklin an adequate post-deprivation remedy. Accordingly, the Court will GRANT Defendants' motion as to Count Six. Count Six will be DISMISSED.

## H.    Count Seven: Totality of Each Combined Act

Count Seven re-alleges each of the previous counts, asserting "that combined together each fact results to a [sic] overall effect that is unconstitutional violating plaintiffs [sic] fifth, fourteenth and eighth Amendments [sic]." (Compl. ¶ 157.) Because Shanklin merely restates, with generality, his previous claims, Count Seven does not allege an independent claim. Therefore, the Court will GRANT Defendants' Motion to Dismiss as to Count Seven. *See Rutland v. Sanders*, No. 8:09-1993-SB, 2009 WL 3737850, at *4 (D.S.C. Nov. 5, 2009) (noting that the court "is not required to consider duplicate claims against the same defendant, that are already pending in this Court"). Accordingly, Count Seven will be DISMISSED.

## I.    Count Eight: Failure to Administer Adequate Remedy

Count Eight alleges Defendants "intentionally failed to right their wrongs" despite Shanklin's requests that they "right their wrong or see to it they get another official to do this." (Compl. ¶ 158.) Defendants counter that Shanklin essentially requests a writ of mandamus against each Defendant, and that he has no remedy in a writ of mandamus because he has available to him an equally effective legal remedy in this action for damages. (Defs. Mem. 14.)

The Court need not address Defendants' argument with respect to the issuance of a writ of mandamus under Virginia law. Shanklin fails to allege what constitutional right Count Eight implicates, much less any violation of a constitutional right. Therefore, because the Court finds that Count Eight fails to allege a constitutional violation, the Court will GRANT Defendants' motion as to Count Eight. Count Eight will be DISMISSED.

## J.    Count Nine:  Retaliatory Treatment

### 1.    Count Nine (A):  Physical Restraint as Retaliation

In Count Nine (A), Shanklin contends Defendants "started to intimidate, harass and torture plaintiff by confining plaintiff in a small crowded poor [sic] ventilated windowless interrogation room restrained at the wrists and ankles for hours, depriving plaintiff of sleep physically and verbally keeping plaintiff awake." (Compl. ¶ 159.)  Shanklin alleges these acts constitute "intentional [r]etaliation against plaintiff" for his failure to cooperate with Defendants, in violation of his Fifth, Eighth, and Fourteenth Amendment rights.  (Compl. ¶ 159.)

As with Shanklin's previous claims, Defendants, presuming Shanklin was held as a pretrial detainee, argue that the violations alleged in Claim Nine (A) fail because Defendants' actions were rationally connected to the custodial interrogation.  (Defs. Mem. 10.)  As previously discussed, the Court has before it insufficient record evidence to determine Shanklin's status at the time of the alleged constitutional violations.  *See Cobb*, 905 F.2d at 788 & n.7.  Accordingly, Defendants' argument fails, and the Court will DENY Defendants' motion as to Count Nine (A).

### 2.    Count Nine (B):  Verbal Threats Regarding Shanklin's Mother

Shanklin alleges Defendants Price, Snyder, Hatfield, Seals, and Beaver "all continually made mention of plaintiff's mother in a [sic] intimidating and assaulting way attempting to force plaintiff to comply to [sic] defendants [sic] demands," in violation of Shanklin's constitutional rights.  (Compl. ¶ 159.)  Defendants contend that Shanklin's allegations regarding verbal abuse and harassment by the interrogating officers fail to give rise to a constitutional violation because the threat did not sufficiently rise to a level that violated § 1983, and because Exhibit C to

Shanklin's Complaint shows that Defendants merely spoke about his mother needing "closure" in a non-confrontational way. (Defs. Mem. 10.)

This Court has held that "[v]erbal harassment and abuse by arresting officers, without more, does not rise to the level of a constitutional claim under § 1983." *Williams v. DeAngelis*, No. 1:07CV824, 2008 WL 3992634, at *7 (E.D. Va. Aug. 28, 2008). "Only when a verbal threat is combined with action apparently designed to carry out the threat can it constitute a claim of constitutional dimension." *Id. (citing Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978)). Shanklin alleges that Defendants threatened to send his mother to jail and that the Defendants brought his mother to him, crying and in handcuffs and shackles, in order to emphasize their threat. (Compl. ¶¶ 76, 90, 94.) On this record, this Court cannot make a finding as to whether such actions rise to a violation of § 1983. *Compare Williams*, 2008 WL 3992634, at *7, *and United States v. Garcia*, 52 F. Supp. 2d 1239, 1255 (D. Kan. 1999) (applying Fifth Amendment noting that coercion might cause a confession to be involuntary, but "merely exhorting the defendant to start telling the truth does not render his confession involuntary"), *with United States v. Finch*, 998 F.2d 349, 355-56 (6th Cir. 1993) ("Coercion may involve psychological threats as well as physical threats. Specifically, threats to arrest members of a suspect's family may cause a confession to be involuntary." *(citing Rogers v. Richmond*, 365 U.S. 534 (1961)); *see also Lynumn v. Illinois*, 372 U.S. 528 (1963) (discussing effects of coercion on voluntariness of confession). Additionally, as discussed above regarding Count Two, Defendants may not rely on the exhibits to Shanklin's Complaint to support their Motion to Dismiss. Accordingly, Defendants' motion will be DENIED as to Count Nine (B).

29

## V. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. (Docket No. 58.) Specifically, Defendants' motion will be DENIED as to Counts One (A), One (B), Two, Four (A), Four (B), Five, Nine (A), and Nine (B). Defendants' motion will be GRANTED as to Counts Three, Six, Seven, and Eight.

An appropriate Order shall issue.

/s/

M. Hannah Lauck
United States Magistrate Judge

Richmond, Virginia
Date: March 26, 2010