# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

WILLIAM SHANKLIN,

      Plaintiff,

v.                                    Civil Action No. 3:07cv319

KENNETH RANDALL SEALS, et al.,

      Defendants.

## MEMORANDUM OPINION

This matter comes before the Court pursuant to four motions:  (1) the Motion for Summary Judgment filed by Defendants Kenneth Randall Seals, Brian Snyder, Steven Hatfield, Traci Brylewski, Jason K. Price, Mark D. Beavers, and Michael Folsom (collectively, "Defendants") (Docket No. 83); (2) Plaintiff William Shanklin's Motion for Court to Issue Any Other Just Order [Pursuant] to Fed. R. Civ. P. 56(f) ("First Rule 56(f) Motion") (Docket No. 110); (3) Shanklin's Motion of Additional Information and Documents to be Considered with Rule 56(f) Motion of the Fed. R. Civ. P. ("Second Rule 56(f) Motion") (Docket No. 126); and, (4) Shanklin's Court Ordered Motion Articulating Why Consideration of the Late Filed Summary Judgment Is Appropriate at This Late Date ("Motion for Leave to File Belated Response") (Docket No. 132).  The matters are ripe for disposition.

For the reasons that follow, the Court will DENY Shanklin's First Rule 56(f) Motion. (Docket No. 110.)  The Court will DENY Shanklin's Second Rule 56(f) Motion.  (Docket No. 126.)  The Court will DENY Shanklin's Motion for Leave to File Belated Response.

(Docket No. 132.) The Court will GRANT Defendants' Motion for Summary Judgment. (Docket No. 83.) The action will be DISMISSED WITH PREJUDICE.

## I. Procedural Background

Because this case has remained on the federal docket for such an extended period of time, some discussion of its procedural history relevant to resolution of the instant motions is necessary.

### A.    Proceedings Prior to Shanklin's Particularized Complaint

Plaintiff William Shanklin, a Virginia prisoner proceeding *pro se*, filed his Complaint on June 4, 2007. (Docket No. 1.) Between June 4, 2007 and November 23, 2007, Shanklin filed a number of motions, including three motions for the appointment of counsel (Docket Nos. 5, 13, 23), a motion to amend his Complaint (Docket No. 11), a motion for a writ of mandamus[1] (Docket No. 12), and a motion to subpoena twelve individuals (Docket No. 25).

On January 8, 2008, the Court denied the motions to appoint counsel, the motion for a writ of mandamus, and the motion for subpoenas. (Jan. 8, 2008 Mem. Order ¶¶ 1-2, 4.) (Docket No. 26.) The Court granted Shanklin leave to amend his Complaint. (Jan. 8, 2008 Mem. Order ¶ 3.) The Court noted, however, that Shanklin had named a number of police officers as defendants, contending that each had violated his constitutional rights during the investigation and prosecution of criminal charges of which Shanklin now stands convicted, and ordered Shanklin to specify any claims that do not necessarily imply that his current conviction and

---

[1] Shanklin's motion for a writ of mandamus requested this Court to direct the state courts of the City of Hampton, Virginia to assist Shanklin in bringing criminal charges against the Defendants named in the instant Complaint. (Mot. Writ Mandamus 1-2.) (Docket No. 12.)

sentence are invalid. (Jan. 8, 2008 Mem. Order ¶ 3 (*citing Heck v. Humphrey*, 512 U.S. 477 (1994)).)

On January 22, 2008, Shanklin moved for an extension of time to respond to the Court's January 8, 2008 Order. (Docket No. 28.) On February 1, 2008, the Court granted Shanklin's motion. (Docket No. 30.) On February 11, 2008, Shanklin responded, but failed to specify his claims as directed in the Court's January 8, 2008 Memorandum Order. (Docket No. 32.)

On March 17, 2008, Shanklin again moved to amend his Complaint. (Docket No. 37.) By Memorandum Order entered April 15, 2008, the Court ordered Shanklin to particularize his Complaint within twenty days of the date of entry of the Memorandum Order. (Docket No. 38.)

On May 5, 2008, Shanklin again moved for an extension of time to respond to the Court's Order (Docket No. 39), and on May 19, 2008, the Court granted the motion (Docket No. 40). The Court ordered Shanklin to file his particularized Complaint within fifteen days from the May 19, 2008 Order. Shanklin did not timely file a particularized Complaint.[2]

---

[2] In a letter dated June 27, 2008, Shanklin claimed to have mailed the Court his particularized Complaint, but indicated that he had not received confirmation from prison officials that it had been mailed as requested. (Letter to the Honorable M. Hannah Lauck, United States Magistrate Judge, Eastern District of Virginia, from William Shanklin, Jr. (June 27, 2008), at 1-2.) (Docket No. 41.) He offered to mail the Court a copy of his Complaint upon Court order. (Letter to the Honorable M. Hannah Lauck, United States Magistrate Judge, Eastern District of Virginia, from William Shanklin, Jr. (June 27, 2008), at 1.) The Court did not order him to produce a copy of the particularized Complaint.

### B.    Shanklin's Particularized Complaint

On September 22, 2008, more than one year after he filed his original Complaint,

Shanklin filed his particularized Complaint.[3] (Docket No. 42.) Shanklin's Complaint pursuant

to 42 U.S.C. § 1983[4] alleges Defendants violated his First,[5] Fourth,[6] Fifth,[7] Sixth,[8] Eighth,[9] and

Fourteenth Amendment[10] rights during their investigation of the disappearance of four-year-old

Davion Mutts. Shanklin asserts nine claims arising from Defendants' conduct during the

investigation of Davion's disappearance:

---

[3]  Shanklin's particularized Complaint is verified. *See* 28 U.S.C. § 1746.

[4]  The statute provides:

Every person who, under color of any statute, ordinance, regulation, custom, or
usage, of any State or Territory or the District of Columbia, subjects, or causes to
be subjected, any citizen of the United States . . . to the deprivation of any rights,
privileges, or immunities secured by the Constitution and laws, shall be liable to
the party injured in an action at law . . . .

42 U.S.C. § 1983.

[5]  "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const.
amend. I.

[6]  "The right of the people to be secure in their persons, houses, papers, and effects,
against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.

[7]  "No person shall be . . . deprived of life, liberty, or property, without due process of
law . . . ." U.S. Const. amend. V.

[8]  "In all criminal prosecutions, the accused shall enjoy the right to . . . have the
Assistance of Counsel for his defence." U.S. Const. amend. VI.

[9]  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and
unusual punishments inflicted." U.S. Const. amend. VIII.

[10]  "No State shall . . . deprive any person of life, liberty, or property, without due process
of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S.
Const. amend. XIV, § 1.

Count One[11]   (A)   "Forceful Departure and Transportation," in violation of Shanklin's Eighth and Fourteenth Amendment rights;

(B)   Deliberate indifference to Shanklin's health and safety by ignoring Shanklin's requests for a seat belt or to loosen his restraints;

Count Two   "Failure to Allow or Provide Access to Legal Counsel" during the course of Defendants' interview of him, in violation of Shanklin's First and Sixth Amendment rights;

Count Three   "Discriminatory Treatment" during Defendants' investigation, in violation of Shanklin's equal protection rights under the Fourteenth Amendment;

Count Four   (A)   "Unwarranted Seizure;" and,

(B)   "Confinement" in a police interrogation room for a period of two days, in violation of Shanklin's Fourth, Eighth, and Fourteenth Amendment rights;

Count Five   "Breach of Duty to Protect," resulting from Defendants' deliberate indifference to Shanklin's health and safety, in violation of Shanklin's Eighth and Fourteenth Amendment rights;

Count Six   "Unwarranted Seizure of Property," in violation of Shanklin's Fifth and Fourteenth Amendment rights;

Count Seven   "Totality of Each Combined Stated Fact;"

Count Eight   "Failure to Administer Adequate Remedy;" and,

Count Nine   "Retaliatory Treatment for Plaintiff's Refusal to Answer Questions or Cooperate," in violation of Shanklin's Fifth, Eighth, and Fourteenth Amendment rights; specifically,

(A)   Defendants intimidated, harassed, and tortured Shanklin by physically restraining him at the wrists and ankles and confining him to a small interrogation room with no opportunity for sleep; and,

---

[11] Count One also asserts an "[u]nwarrantable seizure of plaintiff" in violation of Shanklin's Fourth Amendment rights. Because this claim appears to assert a violation identical to Count Four, however, the Court will not repeat the discussion with respect to Count One.

> (B) Defendants "continually made mention of plaintiff's mother in a [sic] intimidating and assaulting way."

(Compl. ¶¶ 149-60.)[12]

Shanklin seeks a declaration that Defendants have violated his constitutional rights; "[a] preliminary and permanent injunction order[ing] defendants . . . to relinquish all authority vested by the State of Virginia to uphold law and order" (Compl. ¶ 162); "a full investigation into the actions, wrongdoings and misconduct" of Defendants (Compl. ¶ 163); "[c]ompensatory damages in the amount of $100,000 against each defendant," and $200,000 against Defendant Seals (Compl. ¶ 165); "[p]unitive damages in the amount of $200,000 against each [D]efendant" (Compl. ¶ 166); and, finally, costs and any other relief the Court deems appropriate (Compl. ¶¶ 167-68).

Upon its review of Shanklin's particularized Complaint, the Court again ordered him to state explicitly which claims, if any, indicate that his conviction is flawed by violations of his constitutional rights, or to identify with specificity those claims that he alleges do not undermine the validity of his conviction and confinement. (Feb. 23, 2009 Mem. Order 1.) (Docket No. 46.) Shanklin moved for an extension of time to respond to the Court's Order (Docket No. 47), and, on April 21, 2009, filed a statement indicating that none of his claims implied the invalidity of his conviction or sentence (Docket No. 49).

Shanklin served Defendants with his particularized Complaint in June of 2009. (Docket No. 52.) By Memorandum Order dated July 29, 2009, the Court ordered Defendants to file a response to the Complaint by August 12, 2009. (Docket No. 55.)

---

[12] The Court cites Shanklin's particularized Complaint hereafter.

## C.    Defendants' Motion to Dismiss

On August 12, 2009, Defendants filed a Motion to Dismiss for Failure to State a Cause of

Action ("Motion to Dismiss") (Docket No. 58), providing Shanklin with appropriate *Roseboro*[13]

notice (Docket No. 60).  By Memorandum Opinion and Order dated March 26, 2010, the Court

granted in part and denied in part Defendants' Motion to Dismiss.  (Docket Nos. 75, 76.)  The

Court granted Defendants' Motion to Dismiss with respect to Counts Three, Six, Seven, and

Eight.  (Mar. 26, 2010 Mem. Op. 30.)  Because it lacked the factual record it needed to make

specific findings as to certain counts, the Court denied Defendants' Motion to Dismiss with

respect to Counts One (A), One (B), Two, Four (A), Four (B), Five, Nine (A), and Nine (B).

(Mar. 26, 2010 Mem. Op. 30.)  The Court ordered the parties to file dispositive motions within

thirty-five days of the date of entry of the March 26, 2010 Memorandum Opinion and Order.

(Mar. 26, 2010 Order.)  (Docket No. 76.)

## D.    Shanklin's Motion to Alter or Amend

On April 8, 2010, before any dispositive motions had been filed, Shanklin filed a Motion

to Alter or Amend a Judgment ("Motion to Amend").  (Docket No. 78.)  Shanklin moved the

Court to reconsider its decision to dismiss Counts Three, Six, Seven, and Eight of his

particularized Complaint.  (Mot. to Amend 1-5.)

By Memorandum Opinion and Order dated May 3, 2010, the Court denied the motion,

finding that Shanklin's Motion to Amend failed to "demonstrate that the Court materially

misapprehended his position or made a decision outside the adversarial process."  (May 3, 2010

Mem. Op. 7 (*citing Goodman v. Everett*, No. 3:06cv849, at 3 (E.D. Va. June 18, 2009)

---

[13]  *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

(Williams, J.)).) (Docket No. 86.) The Court further found that Shanklin had failed to bring to the Court's attention a significant change in the law or facts since his previous submission to this Court, and that, instead, Shanklin merely attempted "'to put a finer point on his old arguments and dicker about matters decided adversely to him.'" (May 3, 2010 Mem. Op. 7 (*quoting Goodman*, No. 3:06cv849, at 3).)

## E.    Defendants' Motion for Summary Judgment

On April 30, 2010, Defendants filed a timely Motion for Summary Judgment with respect to Counts One (A), One (B), Two, Four (A), Four (B), Five, Nine (A), and Nine (B), providing Shanklin with appropriate *Roseboro* notice. (Docket Nos. 83, 85.) Defendants contend that Shanklin's "remaining claims fail as a matter of law because the Defendants' actions in interviewing and detaining Plaintiff as part of a missing child investigation did not violate Plaintiff's constitutional rights." (Defs.' Mem. Law Supp. Mot. Summ. J. ("Defs.' Mem."), at 13.) (Docket No. 84.)

Shanklin's response to Defendants' Motion for Summary Judgment was due on or about May 20, 2010. On May 9, 2010,[14] however, Shanklin moved the Court to grant his Motion for Subpoena to Examine the Complete Police Officer's [sic] Personnel File[s] and [Tangible] Things ("Motion for Subpoena"), noting that he required this information to respond to Defendants' Motion for Summary Judgment. (Mot. for Subpoena 2.) (Docket No. 89.) Also on May 9, 2010, Shanklin moved the Court for an extension of time to respond to Defendants' Motion for Summary Judgment. (Docket No. 90.) Shanklin represented to the Court that he was

---

[14] Shanklin dated his certificate of service May 9, 2010. For each of Shanklin's filings, the Court will refer to the filing by the date endorsed on the certificate of service, unless otherwise stated.

"rapidly in the process of obtaining affidavits and discovery," and that the facility in which he is incarcerated was on lock down, limiting his access to the law library. (Pl.'s Mot. for Exten[s]ion of Time 1-2.)

By Order dated May 18, 2010, the Court granted Shanklin's motion for an extension of time to file a responsive brief, and ordered him to submit his response to Defendants' Motion for Summary Judgment within twenty days of the date of entry of the Order. (Docket No. 94.) The Court warned Shanklin that it would not grant any further extensions of time. (May 18, 2010 Order 2.) By Order dated May 26, 2010, the Court clarified that Shanklin's responsive brief was due on or about June 7, 2010. (Docket No. 100.)

Additionally, in its May 18, 2010 Order, the Court noted that, in two of his filings, Shanklin had referenced Rule 56(f),[15] but had not moved for relief pursuant to that Rule. (May 18, 2010 Order 2.) The Court advised Shanklin that "[a]ny request for relief pursuant to Rule 56(f) must be in the form of a motion, accompanied by a brief in support thereof, and must comply fully with the Rule." (May 18, 2010 Order 2.)

In lieu of filing a proper Rule 56(f) motion, Shanklin continued to pursue discovery. On May 28, 2010, Shanklin moved the Court to issue subpoenas pursuant to Rule 45 of the Federal

---

[15] Rule 56(f) provides:

> If a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order.

Fed. R. Civ. P. 56(f).

Rules of Civil Procedure. (Docket Nos. 104, 106.) Defendants oppose these motions.[16] (Docket Nos. 113, 114.) On June 17, 2010, Shanklin filed a Motion for Order Compelling Discovery. (Docket No. 122.) Defendants oppose this motion as well. (Docket No. 129.)

### F.     Shanklin's Rule 56(f) Motions

On June 4, 2010, a mere three days before the June 7, 2010 due date for his responsive brief, Shanklin moved the Court to stay summary judgment pursuant to Rule 56(f). (Pl.'s Rule 56(f) Mot. 1.) (Docket No. 110.) June 7, 2010, however, passed without response from Shanklin. On June 25, 2010, the Court received Shanklin's Second Rule 56(f) Motion.[17] (Docket No. 126.) The Court discusses each of these Rule 56(f) motions in Part II, *infra*.

### G.     Shanklin Filed a Belated Response in Opposition to Defendants' Motion

By Order dated June 29, 2010, the Court advised Shanklin that it was in receipt of his Second Rule 56(f) Motion, and that the deadline to file a response to Defendants' Motion for Summary Judgment had expired on June 7, 2010. (June 29, 2010 Order 1-2.) (Docket No. 128.)

---

[16] On June 15, 2010, Shanklin filed a Reply and Opposition to Defendants' Opposition to Plaintiff's Motion for a Subpoena of Names and the Log Sheet(s) ("Pl.'s Names & Log Sheets Reply"). (Docket No. 116.) In his reply brief, Shanklin again argues that the Court should reconsider the claims dismissed by this Court's March 26, 2010 Memorandum Opinion and Order. (*See* Pl.'s Names & Log Sheets Reply 4.) He also advises the Court that he has submitted Freedom of Information Act requests for the same information he seeks via subpoena. (*See* Pl.'s Names & Log Sheets Reply 1-6.)

On June 16, 2010, Shanklin filed a Reply and Opposition to Defendant's [sic] Opposition to Plaintiff's Motion for a Subpoen [sic] Duces Tecum for Police Officer's [sic] Personnel Files ("Pl.'s Personnel Files Reply"). (Docket No. 121.) Shanklin generally contends the information in each Defendant's personnel file will be relevant to his claims.

[17] This document contains two certificates of service: one claims that Shanklin mailed a copy of his Second Rule 56(f) Motion to Defendants on June 4, 2010; the second states that, "[d]ue to delay in the accessibility of the prison Notary Public," the document was mailed to Defendants on June 10, 2010. (Second Rule 56(f) Mot. 2-3.)

The Court advised Shanklin that the discovery motions he had filed remained pending, and that the Court would not consider any additional documents relevant to either Shanklin's First or Second Rule 56(f) Motions or Defendants' Motion for Summary Judgment except upon a showing of an appropriate excuse as to why the document was not timely submitted. (June 29, 2010 Order 2.) The Court warned Shanklin that any additional documents submitted would not be considered in opposition to the Motion for Summary Judgment unless accompanied by a separate motion and memorandum in support thereof articulating why the Court should consider the documents at this late date. (June 29, 2010 Order 2.)

In response to the Court's June 29, 2010 Order, on July 7, 2010, the Court received Shanklin's Motion for Leave to File Belated Response, to which Shanklin attaches his brief in opposition to Defendants' Motion for Summary Judgment. (*See* Mem. Supp. Mot. Leave File Resp.) (Docket No. 133.) In support of this late filing, Shanklin contends that he needs additional discovery, and therefore awaits the Court's ruling on his pending discovery motions, "to combat the Defence [sic] Summary Judgment." (Mem. Supp. Mot. Leave File Belated Resp. 2.) Shanklin informs the Court that he now has the affidavits from his mother, brother, and father, which he asserts are relevant to his opposition to Defendants' Motion for Summary Judgment, and that he continues to seek the assistance of legal counsel. (Mem. Supp. Mot. Leave File Belated Resp. 4-5.)

## II. Shanklin's Rule 56(f) Motions

### A. Standard of Review for Rule 56(f) Relief

Rule 56(f) "permits a court to deny summary judgment or to order a continuance if the nonmovant shows through affidavits that it could not properly oppose a motion for summary

11

judgment without a chance to conduct discovery." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996). Courts "place great weight on the Rule 56(f) affidavit." *Id.* A "Rule 56(f) affidavit must specifically identify what evidence discovery will turn up and how that evidence will allow the party to oppose summary judgment. The affidavit should 'particularly specif[y] legitimate needs for further discovery.'" *Hamilton v. Geithner*, No. 1:08cv1112, 2009 WL 1683298, at *6 (E.D. Va. June 15, 2009) (*quoting Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995)) (alteration in original). "[V]ague assertions as to matters upon which the district court should have allowed discovery to continue" do not suffice to stay a court's decision on a motion for summary judgment. *Nguyen*, 44 F.3d at 242; *see also Boyd v. Guiterrez*, 214 F. App'x 322, 323 (4th Cir. 2007) (No. 05-2323), *available at* 2007 WL 187797, at *1 (affirming the district court's denial of a Rule 56(f) motion because the movant "failed to identify any facts essential to his opposition that were not already available to him"); *Richard v. Leavitt*, 235 F. App'x 167, 167-68 (4th Cir. 2007) (No. 06-1543), *available at* 2007 WL 2348700, at *1 (affirming the district court's denial of a Rule 56(f) motion because the movant "failed to identify relevant information or demonstrate that information relevant to his claim actually existed").

### B. Shanklin's First Rule 56(f) Motion

On June 4, 2010, a mere three days before his response was due, Shanklin moved the Court to stay summary judgment pursuant to Rule 56(f). (Pl.'s Rule 56(f) Mot. 1.) (Docket No. 110.) Shanklin did not submit an affidavit in support of his First Rule 56(f) Motion. Instead, in unsworn briefing, Shanklin contends that he "has witnesses located out of state whom plaintiff had issues in locating and once located plaintiff further experience[d] issues in witness[es] getting proper [a]ffidavits not[a]rized." (Pl.'s Rule 56(f) Mot. 1.) Shanklin asserts

that he has been attempting to gather affidavits for the last six months to one year. (Br. Supp. Pl.'s Rule 56(f) Mot. 1-2.) (Docket No. 111.) Shanklin states that the delay results from his difficulty in locating Vivian Shanklin, James Shanklin, Jr., and James Shanklin, Sr. (Br. Supp. Pl.'s Rule 56(f) Mot. 1.) Shanklin contends that each of these people "will play a marjor [sic] role in plaintiff's suit," that Vivian Shanklin "has information and specific detail which is greatly needed . . . to remove any unanswered questions." (Br. Supp. Pl.'s Rule 56(f) Mot. 1-2.) Additionally, Shanklin contends he is "obtain[ing] affidavits from individuals from other correctional facilities who exspeienced [sic] unjust treatment from the defendants," and that his family has retained counsel to assist in this matter.[18] (Br. Supp. Pl.'s Rule 56(f) Mot. 2.)

Defendants oppose Shanklin's First Rule 56(f) motion on three grounds. First, Defendants contend that this motion "represents another attempt to delay dismissal of this frivolous action," and that "[t]he Court previously warned Plaintiff that there would be no further extensions" of time to respond to Defendants' Motion for Summary Judgment. (Defs.' Mem. Opp'n Pl.'s Rule 56(f) Mot. 1, 3-4.) (Docket No. 115.) Second, Defendants contend that

---

[18] In support of his contention that he has been diligently seeking the assistance of counsel, Shanklin attaches two letters to his Motion for Leave to File Belated Response. (Mem. Supp. Mot. Leave File Belated Resp. Exs. 1, 2.) Each is a response from an attorney who has declined to take Shanklin's case, and each bears a date that falls beyond the deadline by which Shanklin was to have filed a response in opposition to Defendants' Motion for Summary Judgment.

The first letter, from attorney Howard P. Smith, is dated June 14, 2010, and states that the law firm has received Shanklin's "letter of June 8." (Mem. Supp. Mot. Leave File Belated Resp. Ex. 1, Letter from Howard P. Smith, Joseph Smith Ltd., to William Shanklin (June 14, 2010).) June 8 fell one day after the deadline expired for Shanklin to file a response in opposition to Defendant's Motion for Summary Judgment. The second letter, from attorney Michael Morchower, is dated June 21, 2010, and similarly declines to accept Shanklin's case. Shanklin's belated attempts to retain counsel highlight his dilatory conduct rather than excuse it, and fail to demonstrate any basis for Rule 56(f) relief.

Shanklin's motion does not comply with the requirements of Rule 56(f) because "it does not include an affidavit that specifically demonstrates that he cannot present facts essential to justify his opposition." (Defs.' Mem. Opp'n Pl.'s Rule 56(f) Mot. 1, 4-5.) Finally, Defendants contend that Shanklin merely "speculates that the alleged information and affidavits that he claims he may receive will provide the facts essential to justify his opposition." (Defs.' Mem. Opp'n Pl.'s Rule 56(f) Mot. 2, 5-6.)

C.  **Shanklin Is Not Entitled to Relief on His First Rule 56(f) Motion**

Shanklin fails to demonstrate entitlement to relief pursuant to Rule 56(f). First, despite this Court's explicit instruction that any motion pursuant to Rule 56(f) must comply with the Rule (*see* May 18, 2010 Order 2), Shanklin failed to submit an affidavit in support of his motion. Courts have held that "'[a] party may not simply assert in its brief that discovery was necessary and thereby overturn summary judgment when it failed to comply with the requirement of Rule 56(f) to set out reasons for the need for discovery in an affidavit.'" *Nguyen*, 44 F.3d at 242 (*quoting Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 215 (4th Cir. 1993)) (alteration in original). Accordingly, "the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2nd Cir. 1994).

Second, in this motion, Shanklin fails to demonstrate with any specificity those facts he intends to present via the affidavits of Vivian Shanklin, James Shanklin, Jr., James Shanklin, Sr.,[19] or various unidentified inmates, or how such information, if it exists, will be relevant to his

---

[19] The affidavits of Shanklin's family members were later supplied to the Court in an untimely opposition to Defendants' Motion for Summary Judgment. This will be discussed in detail *infra*.

opposition to Defendants' motion. "Rule 56(f) . . . requires more than a conclusory allegation that additional discovery is necessary." *Hamilton*, 2009 WL 1683298, at *6; *see also Richard*, 235 F. App'x at 167-68; *Nguyen*, 44 F.3d at 242. Moreover, the information Shanklin seeks via his various discovery motions, Defendants' personnel files, and the Hampton Police Department's time sheets for the time period Shanklin was interrogated, appear to this Court to be irrelevant to Defendants' motion.

Finally, the record before the Court demonstrates that Shanklin has had ample time to conduct discovery. Shanklin himself admits that he has been attempting to gather affidavits in support of his claims for the past six months to one year. (Br. Supp. Pl.'s Rule 56(f) Mot. 1-2.) The Court finds that the dilatory manner in which Shanklin has litigated this case precludes any further extensions of time to produce evidence supporting his claims.

Accordingly, because Shanklin has failed to meet the requirements of Rule 56(f) and has had ample time to discover evidence supporting his claims, the Court will DENY Shanklin's First Rule 56(f) Motion. (Docket No. 110.)

### D. Shanklin's Second Rule 56(f) Motion Also Does Not Demonstrate Entitlement to Relief

Shanklin's Second Rule 56(f) Motion fails to demonstrate any entitlement to relief and instead underscores Shanklin's dilatory conduct before this Court.[20] The Court finds that, given the inconsistencies among the representations within the motion, it appears likely that Shanklin

---

[20] For example, Shanklin claims he did not anticipate that Defendants would file a motion for summary judgment. "Plaintiff is no mind reader or psychic and had no knowledge as to what the Defence [sic] would likely do." (Pl.'s Reply to Defs.' Mem. Opp'n Second Rule 56(f) Mot. ("Second Rule 56(f) Reply"), at 10.) (Docket No. 135.)

submitted his Second Rule 56(f) Motion in bad faith.[21] Nevertheless, even were the Court to consider the merits of Shanklin's motion, it fails for the same reasons articulated with respect to his First Rule 56(f) Motion.

Shanklin appears to have submitted his Second Rule 56(f) Motion in an effort to comply with the Federal Rule and to correct the deficiencies identified by Defendants in their opposition to his First Rule 56(f) Motion: his Second Rule 56(f) Motion now contains an affidavit in support of the motion.[22] (Br. Supp. Second Rule 56(f) Mot., Ex. 1, Shanklin Aff. ("Second Rule 56(f) Aff.").) (Docket No. 127.) The Court need not rest on a finding of bad faith, however, because even considering the merits of Shanklin's Second Rule 56(f) Motion, he does not demonstrate entitlement to relief.

Shanklin's late submission of an affidavit in support of his motion does not alter the Court's determination that Shanklin does not merit Rule 56(f) relief because, as with his first Rule 56(f) Motion, Shanklin's Second Rule 56(f) Motion does not demonstrate with any specificity those facts he intends to present via the affidavits of Vivian Shanklin, James Shanklin, Jr., James Shanklin, Sr., or various unidentified inmates, or how such information, if it exists,

---

[21] Indeed, the Court notes that, although he claims his difficulties responding to Defendants' Motion for Summary Judgment result in part from the lockdown at the prison facility, which has limited his access to the law library, in the very same brief in which he points out the prison lockdown, Shanklin attempts to distinguish Defendants' case law on the facts. (Second Rule 56(f) Reply 7.) Clearly, therefore, Shanklin has had sufficient access to the law library to respond to Defendants' filings.

[22] Shanklin's reply brief highlights for both the Court and Defendants his recent attempt to comply with the rule: "Plaintiff is not sure if the Defence [sic] has taken the time to research this [Rule 56(f)] so the Plaintiff has written it out for the Defence [sic] to read and understand this." (Second Rule 56(f) Reply 2.) Shanklin then quotes Rule 56(f).

will be relevant to his opposition to Defendants' motion.[23] Nor does Shanklin identify with any specificity what information he contends he will gather from Defendants' personnel files or time sheets that will aid him in defeating the motion for summary judgment.[24] (*See* Second Rule 56(f) Aff. 2 (contending that his outstanding discovery motions seek information relevant to his response to Defendants' Motion for Summary Judgment).)

Accordingly, Shanklin does not merit relief under Rule 56(f). *Hamilton*, 2009 WL 1683298, at *6 ("Rule 56(f) . . . requires more than a conclusory allegation that additional discovery is necessary."); *see also Richard*, 235 F. App'x at 167-68; *Nguyen*, 44 F.3d at 242. The Court will DENY Shanklin's Second Rule 56(f) Motion. (Docket No. 126.)

### III. Shanklin's Motion for Leave to File a Belated Response

Shanklin failed to respond timely to Defendants' motion.[25] Instead, Shanklin filed a July 7, 2010 response to Defendants' motion, in which he tries to explain why the Court should

---

[23] To explain his failure - in his Second Rule 56(f) Motion - to articulate specific facts he anticipates via these affidavits, Shanklin states: "[I]f Plaintiff have [sic] not yet received actual Affidavit[s] from witnesses Plaintiff can't say what's in them it would be speculative . . . ." (Second Rule 56(f) Reply 6.)

As noted in footnote 27, *infra*, this contention is false. On July 7, 2010, Shanklin placed before this court an untimely opposition to Defendants' Motion for Summary Judgment that included a 2008 affidavit of James Shanklin, Sr. and a 2009 affidavit of James Shanklin, Jr. Shanklin clearly had possession at least of his brother's affidavit because he had already placed his brother's affidavit before the Court in November of 2009. (*See* Pl.'s Reply Defs.' Mot. Dismiss Ex. 1, James Shanklin Jr. Aff. (Docket No. 73).)

[24] In any event, as the Court noted above, such information appears to the Court to be irrelevant.

[25] Failure to respond to a motion for summary judgment does not automatically result in entitlement to summary judgment, however. *See Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993). "[T]he moving party must still show that the uncontroverted facts entitle the party to 'a judgment as a matter of law.'" *Id.* (*quoting* Fed. R. Civ. P. 56(c)(2).)

consider this filing.[26] (Docket Nos. 132, 133.) In addition to a proposed memorandum in opposition ("Memorandum in Opposition to Summary Judgment"), he attaches affidavits from family members which, years into this litigation, he alleges have only now become available.[27]

## A. Shanklin Fails to Offer a Persuasive Reason for the Court to Consider this Belated Filing

Shanklin fails to offer any persuasive reason for considering his belated response to the motion for summary judgment. Indeed, this belated filing highlights Shanklin's dilatory conduct rather than excuses it.

First, at least one of the affidavits submitted in opposition to Defendants' Motion for Summary Judgment was already in Shanklin's possession prior to July 7, 2010: in his November 16, 2009 opposition to Defendants' Motion to Dismiss, Shanklin submitted the affidavit of James Shanklin, Jr. (*See* Pl.'s Reply Defs.' Mot. Dismiss Ex. 1, James Shanklin, Jr. Aff.) (Docket No. 73.) Furthermore, the affidavit of his father, James Shanklin, Sr., is dated October 2, 2008. Shanklin offers no plausible explanation as to why he could not have obtained his father's affidavit prior to June 7, 2010.

Second, prior to June 7, 2010, Shanklin had access to at least some of the non-affidavit evidence he attached in belated opposition to the motion for summary judgment. The police

---

[26] Defendants oppose this motion. (Docket No. 136.)

[27] Shanklin attached to his Reply and Opposition to the Defendants' Motion for Summary Judgment three affidavits from family members: the affidavit of James Walter Shanklin, Sr., which was executed on October 6, 2008 (Mot. Leave File Belated Resp., Proposed Ex. 1 ("Shanklin Sr. Aff."); the affidavit of James Shanklin, Jr., which was executed on February 2, 2009 (Mot. Leave File Belated Resp., Proposed Ex. 2 ("Shanklin Jr. Aff.")); and the affidavit of Shanklin's mother, Vivian A. Shanklin, which was executed on June 18, 2010 (Mot. Leave File Belated Resp., Proposed Ex. 3 ("Shanklin's Mother Aff.")).

Interview Activity Log attached as Proposed Exhibit 6 in his belated opposition to the motion for summary judgment also appears as Exhibit A to his particularized Complaint. (*Compare* Mot. Leave File Belated Resp., Proposed Ex. 6 ("Interview Activity Log"), *with* Compl. Ex. A.)

Shanklin's delay in filing this particular affidavit and the Interview Activity Log belies his assertion that he had difficulty locating the affiants or documents he sought to support his opposition to Defendants' motion. Instead, this denotes Shanklin's apparent decision to litigate this matter in the manner he wishes, rather than according to the applicable rules and this Court's orders.[28] Accordingly, in light of Shanklin's conduct before this Court, Shanklin does not merit consideration of his belated response in opposition to Defendants' Motion for Summary Judgment.

### B. Even if Properly Before the Court, Shanklin's Belated Evidence Does Not Aid His Case

Even if the documents attached to his response were properly before the Court, they would do little to aid Shanklin's case.[29] Collectively these documents demonstrate Shanklin's

---

[28] Shanklin attempts to introduce his own testimony by certifying under penalty of perjury to the truth of all of his statements in his Memorandum in Opposition to Summary Judgment. (Mem. Opp'n Summ. J. 28.) Shanklin certainly could have produced his own sworn statements by June 7, 2010. Accordingly, Shanklin's own statements in his Memorandum in Opposition to Summary Judgment will not receive further consideration.

[29] The Court notes that the Shanklin Sr. Affidavit consists almost entirely of inadmissible hearsay. (Shanklin Sr. Aff.) As reflected below, the Court finds the Shanklin Jr. Affidavit similarly deficient:

On Friday, July 15, 2005, while I was being interviewed at the Hampton Police Headquarters, my brother William Shanklin was in a closed room beside me. I could hear him yelling very loudly in pain.
On Saturday, July 16, 2005 I visited my brother William at the Hampton City Jail. During our visit, I noticed bruises on his body similar to slight.. [sic] *In a letter,*

apparent lack of candor before this Court in relating the events surrounding the investigation regarding the disappearance of Davion Mutts.

First, in his untimely opposition, Shanklin submitted non-affidavit documents, such as a police Interview Activity Log and a portion of the transcript of his criminal proceedings, attempting to point out minor inconsistencies in the affidavits submitted by Defendants. (Interview Activity Log; Mem. Opp'n Summ. J. Proposed Ex. 8 ("Trial Tr.").) The Court notes, however, that the Interview Activity Log generally supports Defendants' position that they attended to Shanklin's basic needs during questioning.

Second, the Court notes the transcript of his confession that Shanklin attached to his opposition would be particularly damaging to Shanklin's case. In the present civil rights action, Shanklin details the physical and emotional distress he experienced between July 14 and July 15, 2005, while detained by Defendants. Shanklin attributes all of his distress to the allegedly unconstitutional conditions of his confinement. The transcript suggests, however, that much of

---

> *later that month, he informed me of how he was hit and threaten [sic] by the detectives.* I advised him to let his lawyer know what had happened.

(Shanklin Jr. Aff. (emphasis added).) The italicized sentence is inadmissible hearsay. Although the first four sentences are not hearsay, they are so vague as to be of no use to Shanklin's case. *See United States v. Roane*, 378 F.3d 382, 400-401 (4th Cir. 2004) (stating that "[a]iry generalities, conclusory assertions and hearsay statements [do] not suffice to stave off summary judgment") (internal quotations omitted) (alterations in original). Specifically, Shanklin fails to explain how this alleged screaming or bruising supports his claims. In his own account of the interrogation by Defendants in his complaint, Shanklin does not assert that he yelled in pain or sustained any bruises.

Shanklin's discomfort may have flowed from his anxiety over the repercussions of having

committed a crime against a four-year old child, for which he ultimately was convicted.[30]

---

[30] In that transcript, Detective Seals relays Shanklin's explanation as to what Shanklin did to Davion Mutts:

SEALS:           I told him, "Why don't you just start at the beginning and tell us - - tell me what happened to Davion?"

So at that point Mr. Shanklin told me that - - he indicated that Davion was a very nice young man, but sometimes that Davion was - - would get on his nerves and - - by doing different things, so he had disciplined him with curling irons.

He stated after he had disciplined him with curling irons, that he had went out and purchased vitamins, um, some juices, and ointments and bought gauze to actually help heal the wounds by placing the gauze on his hands with tape with the ointment on it to try to help them heal.

(Trial Tr. 361:5-18.) Then, Shanklin told Detective Seals what had happened on the night Shanklin had reported that Davion had gone missing.

SEALS:           "The same night you reported him missing?"

And he stated, "Yes. He was acting up, so I put him to bed. I went to check on him and he looked funny. He was drooling from the mouth but still breathing lightly."

I asked him, "Did you call the ambulance? Did you take him to a doctor?"

Um, he stated no, he didn't.

I stated, "Go on. Tell me what happened next."

He said, "So I noticed that he wasn't breathing. I thought he was dead. I didn't know what to do. I know she would be mad about this and that's why I said he was missing. I didn't want her to know what happened. I loved her," and then he started or "I love her," and he started crying again.

I asked him, "When you knew that he was not breathing, did you call the ambulance or did you seek any type of medical assistance at all for Davion?"

He stated, "No I didn't. I didn't want her to know what happened."

So I asked him, "Well, what did you do?"

He said, "I carried him to my truck" - -

(Trial Tr. 362:6 -363:7.) Thereafter, Detective Seals explained how Shanklin led him to where he had buried the child's body. (Trial Tr. 367:2-368:10.)

Finally, Shanklin attempted to submit the affidavit of his mother, apparently to support Claim Nine (A), which contends that Defendants wrongfully threatened his mother with prosecution. The affidavit, however, explains why the police suspected she was involved in the disappearance of Davion: because she was present at the residence from which Davion had disappeared, but could not or would not provide any information regarding what had happened to him. (*See* Shanklin Mother Aff.)

Because Shanklin has failed to offer any persuasive reason for the Court to consider his belated Memorandum in Opposition to Summary Judgment, the Court will DENY his Motion for Leave to File Belated Response. (Docket No. 132.)

## IV. Summary Judgment Standard

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. *Celotex*, 477 U.S. at 322-24. These facts must be presented in the form of exhibits and sworn affidavits. Fed. R. Civ. P. 56(c). Furthermore,"'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (*quoting Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 & n.7 (5th Cir. 1992)).

22

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled to have 'the credibility of his evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (*quoting Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). Ultimately, the court must adhere to the affirmative obligation to bar factually unsupportable claims from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (*citing Celotex*, 477 U.S. at 323-24).

## V. Factual Background

Shanklin's verified Complaint, which equates to "an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge," *Williams v. Grifffin*, 952 F.2d 820, 823 (4th Cir. 1991), constitutes Shanklin's only evidence properly before the Court with respect to Defendants' Motion for Summary Judgment.[31] Accordingly, the following summary reflects the facts as established by Defendants' submissions and Shanklin's verified Complaint. The Court views the evidence in the light most favorable to Shanklin.

---

[31] "'[T]o be admissible at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets Rule 56(e)'s requirements.'" *Global Policy Partners, LLC v. Yessin*, 686 F. Supp. 2d 642, 648 (E.D. Va. 2010) (*quoting Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)) (alteration in original). Shanklin attached to his Complaint a number of documents that are not authenticated. Accordingly, these documents will not be considered when evaluating the motion for summary judgment.

### A. Shanklin Arrives at the Police Station at 12:53 a.m. of His Own Free Will and Tells the Police Davion Mutts Has Disappeared

On July 14, 2005, at 12:53 a.m., Shanklin and Matriesha Turner arrived at the Hampton Police Department and reported that Turner's four-year-old nephew, Davion Mutts, had been missing since approximately 9:00 p.m. on July 13, 2005. (Defs.' Mem. Ex. 1, Aff. for Search Warrant for 101 Dooley St. Apt. #B ("Dooley St. Aff."), ¶ 4.) (Docket No. 84.) Shanklin informed police that he last saw Davion at 9:00 p.m. on July 13, 2005. (Dooley St. Aff. ¶ 4.) Shanklin told police that around 9:00 p.m., Davion had been complaining of an injury to his hands that had occurred approximately two days prior to his disappearance when Davion scalded his hands under hot water. (Dooley St. Aff. ¶ 4.) Shanklin stated that he told Davion to wait for Shanklin to give him a bath, but when Shanklin emerged from the bathroom, Davion was gone. (Dooley St. Aff. ¶ 4.)

Shanklin contacted Turner, who was working in Virginia Beach, and informed her that Davion was missing.[32] (Dooley St. Aff. ¶ 4.) They began looking for Davion by driving around the neighborhood. (Dooley St. Aff. ¶ 4.) Neither Shanklin nor Turner asked their neighbors if they had seen Davion. (Dooley St. Aff. ¶ 4.) Approximately four hours after they noticed Davion was missing, Shanklin and Turner contacted the police. (Dooley St. Aff. ¶ 4.)

---

[32] Turner told the police that she was awakened earlier in the week by the sound of a child crying and screaming. (Dooley St. Aff. ¶ 4.) When she went downstairs, she observed Shanklin applying bandages and burn ointment to Davion's hands. (Dooley St. Aff. ¶ 4.) Shanklin told her that Davion had received severe burns to his hands from hot water. (Dooley St. Aff. ¶ 4.)

## B.    Shanklin Consents to a Search of His Residence

After speaking with the police, Shanklin and Turner consented to a search of their home. (Dooley Aff. ¶ 4; Defs.' Mem. Ex. 3, Price Decl. ("Price Decl."), ¶ 2.) During the search, Officer Jason K. Price observed a blue cooler sitting on top of a stool. (Price Decl. ¶ 3.) Inside the cooler, Price observed a bleach-like substance.[33] (Price Decl. ¶ 3.) Next to the cooler, Price observed a George Foreman grill sitting on top of a high chair, and a box of latex gloves on top of the grill. (Price Decl. ¶ 3.) Price observed what appeared to be a drop of blood on the box of latex gloves. (Price Decl. ¶ 3.) Price decided to freeze the scene and obtain a search warrant for 101B Dooley Street.[34] (Price Decl. ¶ 3.)

Before leaving the apartment at 101B Dooley Street, Price asked Shanklin and Turner if they would voluntarily return to the Hampton Police Department to give a statement. (Price Decl. ¶ 4.) Both agreed, and uniformed officers transported Shanklin and Turner back to the police station. (Price Decl. ¶ 4.) The officers did not restrain Shanklin or Turner while transporting them to the police station. (Price Decl. ¶ 4.)

## C.    Shanklin Is Interviewed by Price

At 3:25 a.m. on July 14, 2005, officers placed Shanklin in an interview room at the police station. (Price Decl. ¶ 4.) Shanklin was not restrained. (Price Decl. ¶ 4.) Shanklin felt the ventilation in the room was inadequate. (Compl. ¶¶ 15-16.)

---

[33] The Dooley Street Affidavit indicates that during the consent search of Shanklin's residence, officers found seven empty bottles of bleach in the trash can located outside the home. (Dooley St. Aff. ¶ 4.)

[34] Although not entirely clear, it appears the police suspected the grill had been used to burn Davion and the bleach had been used to clean up blood from Davion's body.

At 6:00 a.m., Price began interviewing Shanklin and asked questions about Davion. (Price Decl. ¶ 5.) Price "reminded Shanklin that he was voluntarily at the station and free to leave at any time. Shanklin stated that he understood." (Price Decl. ¶ 5.) During the interview, Shanklin described Davion's burned hands. (Price Decl. ¶ 6.) Shanklin admitted that Davion's hands were burned and that instead of seeking medical attention he had applied cocoa butter and burn spray, then wrapped Davion's hands in gauze and gray tape. (Price Decl. ¶ 6.) Shanklin complained about the conditions in the room. (Compl. ¶ 18.) Price returned with a cup of water for Shanklin. (Compl. ¶ 18.)

Price then asked Shanklin about the events leading to Davion's disappearance. (Price Decl. ¶ 6.) Shanklin stated Davion had come to the downstairs area of the apartment and stated that his hands hurt. (Price Decl. ¶ 6.) Shanklin was in the restroom, and told Davion to go upstairs and wait for Shanklin to give him a bath. (Dooley St. Aff. ¶ 4.) Shanklin then heard Davion go halfway up the stairs and assumed Davion was watching television. (Price Decl. ¶ 6.) When Shanklin exited the restroom, he could not find Davion. (Dooley St. Aff. ¶ 4.) Shanklin then went upstairs and he could not find Davion. (Price Decl. ¶ 6.) Shanklin stated that he then observed that the front door was ajar and he assumed that Davion had wandered off. (Price Decl. ¶ 6.)

Price then asked Shanklin about the box of latex gloves with the drop of blood on it. (Price Decl. ¶ 8.) Shanklin responded that he did not know how the blood came to be on the box. (Price Decl. ¶ 8.) Price informed Shanklin that officers planned to conduct a search of the Dooley Street apartment pursuant to a search warrant, and asked if the officers would find anything else in the apartment with blood on it. (Price Decl. ¶ 8.) Shanklin informed Price that

26

officers might also find one of Davion's shirts with some blood on it. (Price Decl. ¶ 8.) Shanklin explained that Davion had eczema and picked at his ear lobe, and that as a result, blood had dripped on Davion's shirt. (Price Decl. ¶ 8.)

At or about this time, Shanklin stood up and attempted to leave the interrogation room. (Compl. ¶ 22.) Shanklin informed Price that he no longer felt free to leave the police station. (Price Decl. ¶ 9.) Price informed Shanklin that he was not free to leave because Price was now investigating him for child neglect. (Price Decl. ¶ 9.) Price further told Shanklin, "You better sit your ass down if you know what's best for you. Their [sic] are 30 detectives in the next room over who would love to make sure you . . . stay put and would love to do it especially if plaintiff try anything." (Comp. ¶ 23 (punctuation corrected).) Shanklin then stated that if he could not leave, he wanted to use a phone to call an attorney. (Part. Comp. ¶ 26.) Price left the interview room to retrieve a *Miranda*[35] rights form. (Price Decl. ¶ 9.)

### D.    Shanklin Is Interviewed by Hatfield

At 9:20 a.m., Detective Corporal Steven W. Hatfield entered the interview room, closed the door, and read Shanklin his *Miranda* rights. (Defs.' Mem. Ex. 4, Hatfield Decl. ("Hatfield Decl."), ¶ 3; Compl. ¶ 32.) Shanklin then executed a waiver of his *Miranda* rights. (Defs.' Mem. Ex. 5.) Shanklin informed Hatfield that he wished to continue speaking with him. (Hatfield Decl. ¶ 3.) Shanklin asked for cold water, because the water Price had provided was warm. (Compl. ¶ 32.) Hatfield refused to provide Shanklin with more water. (Compl. ¶ 32.)

Between 9:20 a.m. and 6:40 p.m. on July 14, 2005, Hatfield interviewed Shanklin "off and on," asking questions about Davion's burned hands, how Shanklin treated those burns, and

---

[35] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Davion's behavior on the day that he disappeared. (Hatfield Decl. ¶ 3.) Hatfield describes the interview as "off and on" because from 1:05 p.m. to 2:55 p.m., Shanklin slept. (Hatfield Decl. ¶ 4.) In addition, Shanklin "was offered food and drink six times during the interview," and use of the restroom three times.[36] (Hatfield Decl. ¶ 4.) During the course of the interview, Hatfield refused Shanklin's multiple requests for a more comfortable room and better sleeping accommodations. (Compl. ¶¶ 33-35.)

At 6:40 p.m. on July 14, 2005, on the way back from the bathroom, Plaintiff encountered Detective Corporal Brian Snyder. (Hatfield Decl. ¶ 5; Comp. ¶ 36.) Shanklin informed Snyder that he was tired, wanted to rest in a more comfortable room, and wanted to call an attorney. (Compl. ¶¶ 37-38.) Because Shanklin requested to speak to an attorney, Hatfield states that he terminated the interview and left Shanklin alone in the interview room. (Hatfield Decl. ¶ 5.)

Viewing the facts favorably to Shanklin, more interaction occurred. Specifically, after Hatfield left the interview room, Shanklin knocked on the door to the interview room. (Compl. ¶ 40.) Hatfield then reentered the room and Shanklin requested food, a cold drink, and again requested to be moved to a more comfortable room. (Compl. ¶¶ 40, 41.) Hatfield then provided Shanklin with a soda. (Compl. ¶ 41.) Hatfield explained that he would buy Shanklin food from the nearby McDonald's, get Shanklin a change of clothes, and provide him an opportunity to rest, if Shanklin would provide information for the investigation. (Compl. ¶ 42.) Shanklin refused and asked to speak to Hatfield's commander. (Comp. ¶ 43.) Hatfield told Shanklin that no one was available and that Shanklin would have to speak with him. (Comp. ¶ 44.) Shanklin stated

---

[36] Shanklin complains that on one occasion he was unable to use the bathroom because Hatfield refused to allow Shanklin sufficient privacy. (Compl. ¶ 36.)

that he had nothing to say. (Compl. ¶ 45.) Hatfield told Shanklin one of his relatives was at the Police Department and that the relative could not handle jail. (Compl. ¶ 45.) Shanklin again requested an attorney and phone call. (Compl. ¶ 46.) Hatfield responded, "not right now." (Compl. ¶ 46.) Hatfield again told Shanklin that he would get food from McDonald's if Shanklin would provide helpful information. (Compl. ¶ 46.) Although Shanklin apparently did not provide any information, Hatfield provided Shanklin with two pieces of chicken. (Hatfield Decl. ¶ 5.) Shanklin did not like the chicken because it was "room temperature" and "appeared to have been left out for a long while." (Compl. ¶ 47.)

### E.   Shanklin Asks to Speak with Snyder

At 9:40 p.m. on July 14, 2005, Hatfield secured a search warrant for Shanklin's shoes, clothing, a gun residue sample, and Shanklin's DNA by buccal swab. (Hatfield Decl. ¶ 6.)

At 11:55 p.m. on July 14, 2005, Snyder went to retrieve the buccal swab and gun residue sample from Shanklin. (Hatfield Decl. ¶ 6; Defs.' Mem. Ex. 7, Snyder Decl. ("Snyder Decl.") ¶ 3.) While Snyder was executing the search warrant as to the buccal swab and gun residue, Shanklin asked Snyder what was going to happen to Shanklin's mother and brother, who were also at the Hampton Police Department for questioning relating to Davion's disappearance. (Snyder Decl. ¶ 3.) Snyder knew that Shanklin had invoked his *Miranda* rights, so Snyder told Shanklin that he could not talk to him unless Shanklin's attorney was present. (Snyder Decl. ¶ 3.) Snyder completed the gun residue test and left the room. (Snyder Decl. ¶ 3.)

Shanklin asked the uniformed officer outside the interview room if he could speak with Snyder. (Snyder Decl. ¶ 3.) Snyder returned and asked Shanklin if he wanted to speak with Snyder without his attorney present. (Snyder Decl. ¶ 3.) Shanklin responded affirmatively, and

Snyder asked Shanklin to put that request in writing. (Snyder Decl. ¶ 4.) Shanklin transcribed his request to speak without his attorney present. (Snyder Decl. ¶ 4; Defs.' Mem. Ex. 8.)

Thereafter, Snyder answered Shanklin's questions about his relatives.[37] Viewing the facts favorably to Shanklin, Snyder told Shanklin that he knew Shanklin and his relatives had shot and cut up Davion because bullets were missing from Shanklin's gun and the police had found further evidence in a bathtub and cooler. (Compl. ¶ 48.) Snyder told Shanklin that he better start admitting everything, or Snyder would make sure Shanklin's relative would "never see the light of day ever again." (Compl. ¶ 48.) Snyder informed Shanklin that he had Shanklin's cellular phone records, which reflected Shanklin had been by the James River. (Compl. ¶ 48.) Snyder then asked Shanklin more questions about Davion's disappearance. (Snyder Decl. ¶ 4.).

F.    **Snyder Places Restraints on Shanklin, and Snyder, Hatfield, and Shanklin Leave the Police Station to Look for Davion**

At some point during the ensuing interview, Snyder told Shanklin he was going to take Shanklin for a ride.[38] (Compl. ¶ 53.) Shanklin refused and placed his head on the table. (Compl. ¶ 53.) Snyder pounded the table. (Compl. ¶ 53.) Shanklin responded that "he has nothing to say." (Compl. ¶ 53.) Around 12:30 a.m., Snyder left the room and returned with handcuffs and leg shackles, which he placed on Shanklin. (Compl. ¶¶ 54, 55, 143.) Shanklin asked Snyder to

_____

[37] There is some confusion regarding the order in which Shanklin's conversations with Snyder occurred because in his Complaint Shanklin does not acknowledge that he initiated the conversation about his relatives, requested to speak with Snyder when Snyder left the room, and then signed a statement expressing his desire to talk without an attorney present. Indeed, only in his belated response to the motion for summary judgment does Shanklin admit that he asked about the fate of his relatives prior to Snyder conducting the gun residue test. (Mem. Opp'n Summ. J. 10.)

[38] Snyder declares that Shanklin stated that "he wanted to go for a ride" (Snyder Decl. ¶ 5), but the Court views the facts favorably to Shanklin.

loosen both restraints, "especially the leg shackles because they were tight of the bone on [Shanklin's] ankle." (Compl. ¶ 55.) Snyder refused. (Compl. ¶ 55.)

Snyder told Shanklin that he had a child Davion's age and hated Shanklin's type. (Compl. ¶ 56.) Snyder then spit in Shanklin's face and told him it was time to take a ride. (Compl. ¶¶ 56-57.) Snyder told Shanklin he was going to show Snyder what he wanted. (Compl. ¶ 58.) Shanklin refused. (Compl. ¶¶ 58, 60.) At 2:30 a.m. on July 15, 2005, Hatfield re-entered the interview room and began speaking with Shanklin. (Snyder Decl. ¶ 5; Hatfield Decl. ¶ 7.) Snyder eventually pulled Shanklin out of the room and led him to a unmarked police car.[39] (Compl. ¶¶ 62-64.)

Shanklin stated he did not want to go anywhere and he wanted a lawyer. (Compl. ¶ 64.) Hatfield and Snyder ignored Shanklin. (Compl. ¶ 64.) Snyder pushed Shanklin and Shanklin fell into the car. (Compl. ¶ 65.) Shanklin requested assistance in attaching his seatbelt. (Compl. ¶ 66.) Snyder and Hatfield ignored Shanklin's requests. (Compl. ¶ 66.)

Snyder sat in the back seat of Hatfield's car. (Hatfield Decl. ¶ 8; Snyder Decl. ¶ 5.) Shanklin requested that Hatfield drive past Shanklin's home, and Hatfield did so. (Hatfield Decl. ¶ 8; Snyder Decl. ¶ 6.) Snyder asked Shanklin a series of questions. (Compl. ¶ 67.) When Shanklin did not answer the questions, Snyder hit Shanklin in the head with a notepad. (Compl.

---

[39] As noted previously, the Court reviews this case with the facts viewed in the light most favorable Shanklin. According to Defendants, Shanklin informed Snyder and Hatfield that he wished to go for a ride. (Snyder Decl. ¶ 5; Hatfield Decl. ¶ 7.) Hatfield asked Shanklin if he was planning to show the officers where they could find Davion, and Shanklin "replied, 'let's go for a ride.'" (Hatfield Decl. ¶ 7.) Snyder and Hatfield hoped Shanklin would lead them to Davion. (Hatfield Decl. ¶ 7; Snyder Decl. ¶ 5.) Snyder and Hatfield placed Shanklin in leg restraints and seated him in the front passenger seat of Hatfield's detective vehicle with a seat belt fastened around him. (Hatfield Decl. ¶ 8; Snyder Decl. ¶ 5.)

¶ 67.) Shanklin provided no information as to Davion's whereabouts, so at approximately 5:09 a.m., Snyder and Hatfield returned Shanklin to the Hampton Police Department. (Hatfield Decl. ¶ 8; Snyder Decl. ¶ 6.)

Snyder attempted to pull Shanklin out of the car. (Compl. ¶ 70.) Shanklin struck his head on the way out of the car and fell back inside of the car. (Compl. ¶ 70.) Snyder again attempted to pull Shanklin out of the vehicle, causing Shanklin to strike his forehead and face. (Compl. ¶ 70.) Shanklin experienced sharp pain and felt like he had lost consciousness for a second. (Compl. ¶ 70.)

### G. Shanklin Returns to the Interview Room with Beavers, and Hatfield and Snyder Remove Shanklin's Leg Restraints

Viewing the factual record favorably to Shanklin, on the way into the police station, Shanklin encountered Captain Mark Beavers. (Compl. ¶ 72.) Shanklin complained to Beavers that the restraints were too tight and asked that they be removed. (Compl. ¶ 73.) Beavers told Shanklin he had to talk to him first. (Compl. ¶ 73.) Shanklin stated that he had nothing to talk about and wanted to go home. (Compl. ¶ 73.) Beavers told Shanklin he could only go home if he talked to Beavers first. (Compl. ¶ 73.) Shanklin told Beavers that he wanted a lawyer. (Compl. ¶ 74.) Shanklin complained about the treatment he had received at the hands of Snyder and Hatfield. (Compl. ¶ 74.) Shanklin further complained that the restraints were too tight. (Compl. ¶ 75.) Shanklin was taken back to the interview room. Beavers continued speaking with Shanklin. (Hatfield Decl. ¶ 8.) At some point, Defendants Snyder and Hatfield removed Shanklin's leg restraints and left Shanklin in the interview room with Beavers. (Hatfield Decl. ¶ 8.)

When Shanklin refused to provide answers to Beavers's questions about the location of Davion, Beavers became angry. (Compl. ¶ 76.) Beavers informed Shanklin that he would ensure that Shanklin died by lethal injection. (Compl. ¶ 76.) Beavers further informed Shanklin that both his brother and mother would spend the rest of their lives in jail. (Compl. ¶ 76.) Shanklin asked Beavers for something to eat. (Compl. ¶ 78.) Beavers told Shanklin that he needed to answer his questions before he received anything. (Compl. ¶ 78.) Thereafter, Beavers ignored Shanklin's requests to remove or loosen his handcuffs or to allow Shanklin to contact an attorney. (Compl. ¶¶ 79, 80.) Beavers left the interview room. (Compl. ¶ 80.)

### H.      Shanklin Leaves a Message with His Attorney

Hatfield re-entered the room at 6:22 a.m. and again began speaking with Shanklin. (Hatfield Decl. ¶ 8.) At 6:45 a.m. on July 15, 2005, Shanklin stated that he wanted his attorney present before he answered any further questions. (Hatfield Decl. ¶ 9.) At 6:55 a.m., Shanklin telephoned attorney Alvin "Buddy" Fox and left a message with Fox's answering service. (Hatfield Decl. ¶ 9.)

### I.      Price, Hatfield, and Snyder Confront Shanklin with How His Crimes Have Affected His Mother

Viewing the facts favorably to Shanklin, Price again entered the interview room. (Compl. ¶ 87.) Price pulled out Turner's cell-phone and showed Shanklin a picture of his mother holding a Bible and crying.[40] (Compl. ¶ 89.) Price began laughing and stated that it was Shanklin's fault that his mother was crying. (Compl. ¶ 89.) Hatfield and Snyder then arrived in the interview room escorting Shanklin's mother, who was in leg and arm restraints. (Compl. ¶ 90.)

---

[40] Price swears, "At no point during the interview did I show Shanklin any photographs, by phone or other means, [of] Shanklin's mother, Vivian Shanklin." (Price Decl. ¶ 7.)

33

Hatfield and Snyder told Shanklin's mother to speak with Shanklin about the topics they had discussed. (Compl. ¶ 92.) Shanklin's mother started to cry and then told Shanklin that, "the defendants told her she could go home if [Shanklin] talks so please talk." (Compl. ¶ 93.) Snyder, Hatfield, and Price laughed and then left the room with Shanklin's mother. (Compl. ¶¶ 94-95.)

### J. Shanklin Contacts his Attorney and Provides Directions to the Location of Davion's Body

Around 9:00 a.m., Shanklin spoke with his attorney on the phone. (Compl. ¶ 98.) Fox arrived at the Hampton Police Department around 9:35 a.m., and the police asked Fox if he could help locate Davion. (Hatfield Decl. ¶ 9.) Fox spoke with Shanklin for 10 to 15 minutes, then exited the interview room and requested two witnesses. (Hatfield Decl. ¶ 10.) Hatfield and Sergeant Caison entered the interview room with Fox. (Hatfield Decl. ¶ 10.) "Fox asked Shanklin if Fox could release the location of the missing child to the detectives, and Plaintiff replied with yes." (Hatfield Decl. ¶ 10.) Fox informed the officers that they could find Davion in the area of the crossover bridge by Hampton High School, then advised Shanklin not to say anything else. (Hatfield Decl. ¶ 10.)

Hatfield and two other officers drove to the crossover bridge by Hampton High School, and the police also dispatched K-9 units to the area. (Hatfield Decl. ¶ 11.) Two dogs entered the wooded area to search for Davion, but neither located him. (Hatfield Decl. ¶ 11.)

### K. Seals Places Shanklin in Leg Restraints and Takes Shanklin to Look for Davion

After Fox left the Hampton Police Department, Shanklin asked Officer V.J. DiPentima if he could speak with an officer. (Defs.' Mem. Ex. 9, Seals Decl. ("Seals Decl."), ¶ 3.) The

parties' accounts diverge as to what happened next, albeit in what amounts to a non-material way which the Court explains in its findings, *infra*, Part VI.

### 1. Defendants' Version

Captain K. Randall Seals went to the interview room to speak with Shanklin. (Seals Decl. ¶ 3.) Seals knew that Shanklin had invoked his *Miranda* rights, spoken with Fox, and then reinitiated contact with Officer DiPentima. (Seals Decl. ¶ 3.) Seals asked Shanklin if he wished to speak to Seals without his attorney present, and Shanklin responded affirmatively. (Seals Decl. ¶ 4.) Seals again advised Shanklin of his *Miranda* rights and had Shanklin sign a *Miranda* waiver. (Seals Decl. ¶ 4; Defs.' Mem. Ex. 10.) Seals asked Shanklin if Shanklin was ready to show Seals Davion's location. (Seals Decl. ¶ 5.) Seals requested that Sergeant Traci Brylewski come to the Hampton Police Department to drive Seals and Shanklin to Davion's location. (Seals Decl. ¶ 5.)

At 12:30 p.m. on July 15, 2005, Brylewski arrived at the police station in an unmarked police car. (Seals Decl. ¶ 6.) Seals placed Shanklin in leg restraints and seated him in the rear right passenger seat and placed a seat belt around him. (Seals Decl. ¶ 6.) Seals sat beside Shanklin in the left rear passenger seat and Brylewski drove. (Seals Decl. ¶¶ 6-7.) Shanklin gave Brylewski directions to Davion's body. (Seals Decl. ¶ 7.)

At approximately 12:45 p.m., Seals and Brylewski arrived with Shanklin at the area around the crossover bridge by Hampton High School. (Hatfield Decl. ¶ 12.) Shanklin took the officers to a wooded area and pointed to a small pile of leaves. (Seals Decl. ¶ 7; Hatfield Decl. ¶ 12.) The officers could see part of Davion's body under the leaves. (Seals Decl. ¶ 7.) Seals then asked Shanklin to lead the officers out of the wooded area the way he had left the area.

35

(Seals Decl. ¶ 8.) Seals, Brylewski, and Shanklin returned to Brylewski's unmarked car and drove back to the police station. (Seals Decl. ¶ 8.) Hatfield stayed with the body, as the area was now a crime scene. (Hatfield Decl. ¶ 12.) At 1:17 p.m. on July 15, 2005, Seals returned Shanklin to the interview room at the Hampton Police Department. (Seals Decl. ¶ 8.)

### 2.    Shanklin's Version

According to Shanklin, Seals entered the interview room around 12:00 p.m. (Compl. ¶ 99.) Shanklin complained that his restraints had been on for twelve hours and were too tight. (Compl. ¶ 101.) Shanklin also asked for something to eat. (Compl. ¶ 102.) Seals denied Shanklin's requests. (Compl. ¶ 102.) Seals called Shanklin names and ignored Shanklin's further requests for relief with respect to food, rest, and release from the restraints. (Compl. ¶ 103.) Seals told Shanklin that he better talk or Seals would make sure both Shanklin and his mother die. (Compl. ¶ 104.) Shanklin stated that he did not want to talk without an attorney. (Compl. ¶¶ 104, 106.) Seals left the room at 12:20 p.m. (Compl. ¶ 107.)

Shortly thereafter, Seals reentered the room and told Shanklin that Shanklin's attorney had advised Shanklin to identify Davion's body. (Compl. ¶ 108.) Shanklin asked where his attorney was. (Compl. ¶ 111.) Seals told Shanklin that his attorney would meet them and he then grabbed Shanklin by the arm and moved him out of the building. (Compl. ¶¶ 111-12.) Shanklin asked that the hand and leg restraints be removed because they hurt. (Compl. ¶ 112.) Seals told him the trip would not take long. (Compl. ¶ 112.)

Once outside the building, another police officer provided Shanklin with a can of soda. (Compl. ¶ 113.) Seals told Shanklin to get in an unmarked police car, driven by Brylewski. (Compl. ¶¶ 115, 117.) Shanklin complained that the car was hot, he wanted a seat belt, and that

his restraints hurt. (Compl. ¶¶ 118-19.) Brylewski ignored Shanklin's complaints and drove through a series of police road blocks; Seals ignored Shanklin's inquiries about his attorney's whereabouts. (Compl. ¶¶ 120-125.) When they arrived at their destination by a crossover bridge, Hatfield, who was already at the bridge, pulled Shanklin from the police car. (Compl. ¶¶ 126, 127.) Hatfield, accompanied by Brylewski and Seals, then led Shanklin over the bridge. (Compl.     ¶ 128.) Shanklin observed an Asian officer enter the woods. (Compl. ¶ 128.) After leading Shanklin through the woods for a while, Shanklin, Hatfield, and Brylewski returned to Brylewski's car. (Compl. ¶¶ 129-139.)

Once back at the car, Shanklin repeatedly requested that Brylewski remove his restraints. (Compl. ¶ 139.) Seals placed Shanklin in the car. (Compl. ¶ 140.) Shanklin asked about the whereabouts of his attorney. (Compl. ¶ 140.) Shanklin also requested that Seals remove his restraints and attach Shanklin's seat belt. (Compl. ¶ 140). Brylewski then drove Shanklin back to the police station.[41] (Compl. ¶ 141.)

**L.      Shanklin Is Transported to the Adult Lock Up**

At 5:50 p.m. on July 15, 2005, officers transported Shanklin to adult lock up for processing. (Price Decl. ¶ 10.) At 6:30 p.m., Price obtained arrest warrants for Shanklin for murder and child neglect. (Price Decl. ¶ 10; Defs.' Mem. Ex. 11.)

---

[41] Although Shanklin provides a different version of events, he does not offer evidence that disputes or explains the Defendants' evidence that Shanklin actually led the police Davion's body.

# VI. Analysis

**A.     At the Time of the Alleged Constitutional Violations, Defendants Held Shanklin as a Pretrial Detainee**

In any action pursuant to § 1983, the Court must first identify the contours of the underlying right said to have been violated. *Graham v. Connor*, 490 U.S. 386, 394 (1989). This requires a determination of Shanklin's status at the time of the alleged violations. *United States v. Cobb*, 905 F.2d 784, 788 (4th Cir. 1990). The record reflects that Shanklin voluntarily arrived at the Hampton Police Department on July 14, 2005 to report that Davion was missing. (Dooley St. Aff. ¶ 4.) Similarly, after consenting to a search of the residence, Shanklin voluntarily returned to the Hampton Police Department. (Price Decl. ¶ 4.) Accordingly, Shanklin arrived at the Hampton Police Department a free citizen.

Shanklin did not remain at the police station voluntarily, however. On the morning of July 14, 2005, having interviewed Shanklin regarding Davion's disappearance, Price determined that Shanklin was no longer free to leave the police station. (Price Decl. ¶ 9.) Price had participated in the search of Shanklin's home, and during his interview with Shanklin, Shanklin "made several statements that raised Price's suspicions about how Davion disappeared." (Defs.' Mem. 15; *see also* Price Decl. ¶¶ 3, 6.) Shanklin told Price he no longer felt free to leave, and Price informed him he could not leave the police station. (Price Decl. ¶ 9.) Price informed Shanklin that he was under investigation for child neglect (Price Decl. ¶ 9), and Hatfield read Shanklin his *Miranda* rights. (Hatfield Decl. ¶ 3.)

"The test for determining whether an individual is in custody or under arrest is whether, under the totality of the circumstances, the 'suspect's freedom of action is curtailed to a degree

associated with formal arrest.'" *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001) (*quoting Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). Here, although Shanklin had voluntarily entered the police station, Price told him he could not leave and that he was under investigation for a crime, and Hatfield read Shanklin his *Miranda* rights. Accordingly, the Court finds that Shanklin's freedom of action had been curtailed to a degree associated with formal arrest. *Park*, 250 F.3d at 850. Therefore, at this point, Shanklin became a pretrial detainee. *See Cobb*, 905 F.2d at 788 ("[Plaintiff], as one lawfully arrested and being held prior to a formal adjudication of guilt, was a pretrial detainee." (*citing Martin v. Gentile*, 849 F.2d 863, 865-66 (4th Cir. 1988)); *see also Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008).

### B.  Count One Does Not Survive Summary Judgment

In Count One (A), Shanklin claims Defendants "forced [him] to unwillingly get into a [sic] unmarked police cruiser without a safety seat belt" despite his "unwillfulness [sic] to leave," violating his rights to due process and to be free from cruel and unusual punishment. (Compl. ¶ 149.) In Count One (B), Shanklin also contends that Defendants Hatfield and Snyder "excercised [sic] deliberate indifference to plaintiff's health and safety by ignoring plaintiff repeatedly requests [sic]" to place him in a seat belt and to loosen his restraints. (Compl. ¶ 149.) For the reasons stated below, each of these claims fails.

For pretrial detainees held prior to an adjudication of guilt, the Due Process Clause of the Fourteenth Amendment provides the proper constitutional lens through which to view allegations of unconstitutional punishment.[42] *Bell v. Wolfish*, 441 U.S. 520, 537 n.16 (1979); *Ingraham v.*

---

[42] As the Court explained in its March 26, 2010 Memorandum Opinion, the Eighth Amendment prohibition against cruel and unusual punishment does not apply to Shanklin's claims because it applies only after an adjudication of guilt. (Mar. 26, 2010 Mem. Op. 16-17 (*citing Graham*, 490 U.S. at 392 n.6; *Ingraham*, 430 U.S. at 671-72 n.40).)

*Wright*, 430 U.S. 651, 672 n.40 (1977); *Cobb*, 905 F.2d at 788. "[T]he pretrial detainee, who has yet to be adjudicated guilty of any crime, may not be subjected to *any* form of 'punishment.'" *Martin*, 849 F.2d at 870 (*citing City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)); *Bell*, 441 U.S. at 537 n.16. "Only governmental conduct that 'shocks the conscience' is actionable as a violation of the Fourteenth Amendment." *Young v. City of Mount Rainier*, 238 F.3d 567, 574 (4th Cir. 2001) (*quoting County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998)). "'There is, of course, a *de minimis* level of imposition with which the Constitution is not concerned.'" *Bell*, 441 U.S. at 539 n.21 (*quoting Ingraham*, 430 U.S. at 674).

To determine whether a condition imposed upon a pretrial detainee constitutes punishment, the Court "must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539. Thus, to demonstrate a Due Process violation, Shanklin must show that Defendants' conduct was intended to punish him. *Cooper v. Dyke*, 814 F.2d 941, 948-49 (4th Cir. 1987). "[P]unishment, whether for a convicted inmate or a pretrial detainee, is the product of intentional action, or intentional inaction, respecting known and *substantial* risks of harm." *Westmoreland v. Brown*, 883 F. Supp. 67, 72 (E.D. Va. 1995). Accordingly, to survive summary judgment with respect to "a claim of punishment without due process under the Fourteenth Amendment, an inmate must [demonstrate] not only that the defendants were deliberately indifferent to the substantial risk of harm posed by [the challenged condition or action], but also that this deliberate indifference *caused* a physical or emotional injury." *Id.* at 76.

40

## 1. Forcing Shanklin to Ride in a Vehicle Without a Seatbelt Did Not Violate Shanklin's Due Process Rights

Accepting Shanklin's version that he was forced to ride around in a police car on two occasions after he was arrested, no evidence exists from which a reasonable juror could conclude such conduct was intended as punishment. Rather, it is clear from the record that Defendants intended Shanklin to lead them to the location of Davion, who had been in Shanklin's care when he allegedly had wandered off. Furthermore, Shanklin has failed to introduce evidence that forcing Shanklin to ride in a vehicle without a seatbelt fastened posed a substantial risk of harm or resulted in any constitutionally significant injury. *See Spencer v. Knapheide Truck Equip. Co.,* 183 F.3d 902, 906 (8th Cir. 1999) (concluding that transporting pretrial detainees in vehicles without safety restraints does not pose a substantial risk of serious harm); *see also Smith v. Sec. for Dep't of Corr.,* 252 F. App'x 301, 303-04 (11th Cir. 2007) (No. 06-11933) (agreeing with the Eighth Circuit that transporting inmates without safety restraints does not pose a substantial risk of serious harm), *available at* 2007 WL 3089531, at *3.

## 2. Shanklin Fails to Demonstrate that Hatfield's and Snyder's Use of Restraints Amounted to Unconstitutional Punishment

Furthermore, Shanklin fails to demonstrate that Hatfield and Snyder placed him in restraints as a means of punishing him. As the Court noted above, at the time Shanklin alleges this incident occurred, Defendants held Shanklin as a pretrial detainee: they were investigating him for child neglect and suspected that Shanklin could lead them to the location of the child he had reported missing. (Hatfield Decl. ¶ 7; Snyder Decl. ¶¶ 5-6.) As Defendants argue, "[t]he leg restraints are rationally related to the legitimate purpose of preventing the detainee's escape while

he is being transported."[43] (Defs.' Mem. 18.) Although Shanklin complained that the restraints were causing him some discomfort, he fails to allege facts that the restraint posed a substantial risk of harm to his person, much less that he sustained a constitutionally significant injury. *See Carter v. Morris*, 164 F.3d 215, 219 n.3 (4th Cir. 1999) ("[Plaintiff's] basis for her excessive force claim - that her handcuffs were too tight and that an officer pushed her legs as she got into the police car - is so insubstantial that it cannot as a matter of law support her claim under either the Fourth Amendment or the Fourteenth.") (internal citations omitted); *Martin*, 849 F.2d at 871.[44] Accordingly, Defendants' Motion for Summary will be GRANTED as to Counts One (A) and (B), and Counts One (A) and (B) will be DISMISSED.

### C.    Count Two Does Not Survive Summary Judgment

In Count Two, Shanklin contends Defendants Hatfield, Snyder, Price, Beavers, Seals, and Brylewski denied him access to counsel despite his repeated requests to contact an attorney, in violation of his First and Sixth Amendment rights.[45] (Compl. ¶ 150.) Because Shanklin's Sixth

---

[43] Defendants have not provided any evidence to indicate that use of leg restraints constitutes Hampton Police Department policy when transporting a suspect. Nevertheless, the Court finds that use of restraints during the transportation of a suspect does not imply an intent to punish.

[44] As explained in greater detail *infra* in Part IV.E, this claim also fails when analyzed as an excessive use of force.

[45] Shanklin alleges a First Amendment violation in the sense that he was prohibited from speaking with his attorney. (*See* Compl. ¶ 150.) This more squarely falls under a claim of denial of access to counsel. Therefore, the Court will not undertake a First Amendment analysis.

Amendment right to counsel had not attached at the time Defendants questioned him regarding Davion's disappearance, this claim must fail.[46]

In a criminal prosecution, the Sixth Amendment right to counsel attaches at the initiation of adversarial judicial proceedings, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. *United States v. Gouveia*, 467 U.S. 180, 188 (1984); *Kirby v. Illinois*, 406 U.S. 682, 689-90 (1972). In this case, the conduct about which Shanklin complains occurred well before the initiation of any formal adversarial proceedings: the record reflects that Shanklin had been detained because Defendants suspected him of child neglect (and of playing a role in Davion's disappearance), but that no formal criminal charges had been lodged. Accordingly, Shanklin's Sixth Amendment right to counsel had not yet attached. *See Gouveia*, 467 U.S. at 190 ("[W]e have never held that the right to counsel attaches at the time of arrest."); *accord James v. York County Police Dep't*, 160 F. App'x 126, 132 (3d Cir. 2005) (No. 05-2852), *available at* 2005 WL 3313029, at *3. Defendants' Motion for Summary Judgment will be GRANTED as to Claim Two. Claim Two shall be DISMISSED.

### D.    Count Four Does Not Survive Summary Judgment

Count Four alleges Defendants unlawfully seized and confined Shanklin in a police interrogation room "for nearly two days refusing to allow plaintiff to be transfered [sic] to a proper area for sleeping, resting and climate with adequate ventilation and space." (Compl. ¶ 152.) Shanklin contends this constituted deliberate indifference to Shanklin's health and

---

[46] Although Shanklin's exact legal theories for relief are often vague, he has explicitly assured the Court that he is not seeking to interfere with his criminal conviction by pursuing his present claims. (Pl.'s Apr. 21, 2009 Resp. (Docket No. 49).) Accordingly, the Court cannot view Shanklin as claiming that he is entitled to relief because Defendants unconstitutionally elicited statements from him that were subsequently used to convict him.

safety, cruel and unusual punishment, and a violation of his due process rights.[47]  (Compl. ¶152.)
For the reasons discussed below, Count Four fails.

### 1.    Count Four (A):  Unwarranted Seizure

"It has been consistently recognized that the Fourth Amendment protects a citizen's right
to be free from unreasonable seizures." *Unus v. Kane*, 565 F.3d 103, 119 (4th Cir. 2009).  Thus,
the moments constituting Shanklin's initial confinement to the police interrogation room are
governed by the Fourth Amendment. *See Wilkins v. May*, 872 F.2d 190, 192 (7th Cir. 1989)
("'Whenever an officer restrains the freedom of a person to walk away, he has seized that person'
within the meaning of the Fourth Amendment." (*quoting Tennessee v. Garner*, 471 U.S. 1, 7
(1985)); *see Riley v. Dorton*, 115 F.3d 1159, 1162 (4th Cir. 1997), *overruled on other grounds by
Wilkins v. Gaddy*, 130 S. Ct. 1175 (2010).

An arrest constitutes a seizure under the Fourth Amendment. *See Garner*, 471 U.S. at 7.
"A warrantless arrest is . . . permitted where there is probable cause based on a subjective
standard to believe a felony is being or has been committed by the arrested individual, based
upon the totality of the circumstances." *Park*, 250 F.3d at 850 (*citing Illinois v. Gates*, 462 U.S.
213, 230-31 (1983)).  "[P]robable cause is a fluid concept - turning on the assessment of the
probabilities in particular factual contexts." *Gates*, 462 U.S. at 232.  The Fourth Circuit has
defined probable cause as "facts and circumstances within the officer's knowledge [that] would

---

[47]  Count One also alleges that Defendants improperly seized Shanklin in violation of the
Fourth Amendment. (Compl. ¶ 149.)  In support of this claim, Shanklin re-alleges paragraphs 1
through 147 of his Complaint. (Compl. ¶ 149.)  The Court construes this claim as an allegation
that Shanklin's seizure for interrogation purposes, and then his subsequent confinement to an
interrogation room, violated the Fourth Amendment. (*See* Compl. ¶ 152 (re-alleging that
Shanklin's confinement to an interrogation room violated the Fourth Amendment).)

warrant the belief of a prudent person that the arrestee had committed or was committing an offense." *United States v. Manbeck*, 744 F.2d 360, 376 (4th Cir. 1984).

Here, Defendants had probable cause to seize Shanklin without a warrant. Price determined Shanklin was no longer free to leave the Hampton Police Department because his interview with Shanklin raised questions about Shanklin's role in Davion's disappearance. Specifically, Price knew that Shanklin had waited to call the police for at least two hours after Davion allegedly disappeared; Shanklin told Price that Davion had burn injuries; and, during a consent search of Shanklin's home, Price had discovered a cooler containing a bleach-like substance, a George Foreman grill on top of a child's high chair, and a box of latex gloves with a drop of blood on it. (Price Decl. ¶¶ 2, 3, 6.) Accordingly, based on the totality of the circumstances, Price had sufficient probable cause to seize Shanklin for child neglect. *See Park*, 250 F.3d at 850; *Manbeck*, 744 F.2d at 376.

The use of excessive force during an arrest may also result in a Fourth Amendment violation. *Graham*, 490 U.S. at 395. "Excessive force claims are analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002) (*quoting Graham*, 490 U.S. at 388). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (*quoting Garner*, 471 U.S. at 8) (internal quotation omitted). Courts should evaluate excessive force claims with respect to the officer's on-scene perspective as to the appropriate level of force required. *Brown*, 278 F.3d at 369 (*quoting Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

45

Review of the record under the Fourth Amendment's "objective reasonableness" standard reflects that Defendants used no force to seize Shanklin. Price told Shanklin he was no longer free to leave the police station, and Hatfield read Shanklin his *Miranda* rights. (Price Decl. ¶ 9; Hatfield Decl. ¶ 3.) Defendants used no force to effectuate the arrest. Accordingly, the Court finds that Shanklin suffered no violation of his Fourth Amendment rights resulting from any use of excessive force during his arrest. Defendants' Motion for Summary Judgment will be GRANTED as to Count Four (A). Count Four (A) shall be DISMISSED.

### 2. Count Four (B): Unwarranted Confinement to the Interview Room

Because the Fourth Circuit "has rejected any concept of a continuing seizure rule," the Due Process Clause of the Fourteenth Amendment governs this claim of continuing confinement. *Robles v. Prince George's County*, 302 F.3d 262, 268 (4th Cir. 2002) (*citing Riley*, 115 F.3d at 1163)); *Riley*, 115 F.3d at 1164 (holding that "the Fourth Amendment does not embrace a theory of 'continuing seizure' and does not extend to the alleged mistreatment of arrestees or pretrial detainees in custody"); *Wilkins*, 872 F.2d at 193-95 (rejecting the concept of a "continuing seizure" under the Fourth Amendment and finding that the Due Process Clause governs claims of persons in custody who have been arrested, but not yet charged). As explained above, to allege a Due Process violation, Shanklin must show that Defendants' conduct was intended to punish him. *Cooper*, 814 F.2d at 948-49.

To determine whether a condition imposed upon a pretrial detainee constitutes punishment, the Court "must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 538. "[I]f a particular condition or restriction of pretrial detention is reasonably

related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539. Questioning a detainee about the crimes he is alleged to have committed is a legitimate government objective. *See Martin*, 849 F.2d at 871 (concluding fourteen-hour delay in providing medical care for minor injuries "was but an incident of a legitimate governmental objective-interrogating a suspect immediately following his arrest").

### a. Summary Judgement Evidence with Respect to Shanklin's Confinement in the Interview Room

At this juncture, the Court finds it appropriate to summarize the evidence, viewed favorably to Shanklin, with respect to Shanklin's confinement in the interview room. Shanklin was involuntarily confined to the interview room off and on between 9:00 a.m. on July 14, 2005 (Hatfield Decl. ¶ 2), and until roughly July 15, 2005, at 5:50 p.m[48] (Price Decl. ¶ 10). During this period of confinement, Shanklin was offered the opportunity to use the restroom on at least three occasions.[49] (Hatfield Decl. ¶ 4.) Additionally, Shanklin was occasionally left alone in the room and allowed to sleep.

On July 14, 2005, between 9:20 a.m. and 6:40 p.m., Shanklin was offered food and drink six times.[50] (Hatfield Decl. ¶ 4.) Later that evening, Shanklin requested food and was provided chicken and a soda. (Hatfield Decl. ¶ 5.) Shanklin did not like the chicken and declined to eat it. (Compl. ¶ 47.) On July 15, 2005, Shanklin told Beavers that he would like to get something to

---

[48] Defendants removed Shanklin from the interview room and drove him around in a police car on two occasions during this period.

[49] There is no evidence that Defendants denied any of Shanklin's requests to use the restroom.

[50] As noted above, Shanklin did not like the water offered because it was warm. (Compl. ¶ 32.)

eat. (Compl. ¶ 78.) Beavers refused to accommodate Shanklin. (Compl. ¶ 78.) Shanklin requested food from Seals around noon on July 15, 2005. (Compl. ¶¶ 102, 103.) Although Seals ignored this request, an unnamed officer provided Shields with a soda shortly thereafter. (Compl. ¶ 113.) There is no evidence that Shanklin subsequently requested or was provided with food and drinks prior to his transportation to the adult lock-up.[51]

Other than brief trips to the restroom, no evidence exists that Defendants placed restraints on Shanklin until about 12:30 a.m. on July 15, 2005. At that time, Snyder placed handcuffs and leg shackles on Shanklin in preparation for driving Shanklin to look for Davion. (Compl. ¶¶ 53-55,143; Snyder Decl. ¶ 5.) Upon returning to the interview room later that morning, Hatfield removed the leg restraints, but left Shanklin in handcuffs.[52] (Hatfield Decl. ¶ 8.) Shanklin was not placed in leg restraints again until around 12:30 p.m., on July 15, 2005, when Seals took Shanklin to look for Davion's body. (Seals Decl. ¶ 6.) After his return to the interview room at 1:17 p.m., Shanklin apparently remained in leg restraints and handcuffs until his transportation to the adult lock-up at 5:50 p.m.

---

[51] The Interview Activity Log, which Shanklin attached to his particularized Complaint and his belated Memorandum in Opposition to Summary Judgment, reflects that at 3:10 p.m. on July 15, 2005, Shanklin was asked if he wanted anything and he stated "'NO.'" (Compl. Ex. A; Mem. Opp'n Summ. J. Ex. 5 at 1.) Even if this Court could consider this untimely evidence, it would not aid Shanklin's claim.

[52] In his complaint, Shanklin repeatedly refers to the improper use of restraints. Shanklin, however, often fails to distinguish between handcuffs and leg restraints. Moreover, Shanklin has not disputed Defendants' specific evidence regarding when they placed him in leg restraints and when they removed the leg restraints. Defendants, for their part, do not dispute Shanklin's evidence with respect to the use of handcuffs.

b.  **Shanklin Fails to Establish that His Conditions in the Interview Room Amounted to Unconstitutional Punishment**

The record demonstrates that Defendants' conduct was not intended to punish Shanklin. Defendants confined Shanklin to an interview room while they questioned him about the disappearance of Davion. Indeed, Shanklin's own statements indicated that time was of the essence in locating Davion in light of Davion's age and his severe burns. *See Gilbert v. French,* 665 F. Supp. 2d 743, 762 (S.D. Tex. 2009) ("Given the severity and urgency of what the police legitimately believed was an ongoing, violent hostage situation, the decision to question [detainee] while he was receiving care at the hospital was not objectively unreasonable.").

Moreover, Shanklin has failed to adduce evidence from which a reasonable juror could conclude the totality of the conditions of confinement posed a substantial risk of harm to his person or that Defendants were deliberately indifferent to that risk. *See Westmoreland,* 883 F. Supp. at 76. While Shanklin certainly found the interview room unpleasant and a difficult place to sleep, such discomforts are insufficient to support a constitutional claim. *See Tesch v. County of Green Lake,* 157 F.3d 465, 476 (7th Cir. 1998) (concluding that requiring a detainee "to wear the same clothes, or receive beverages only with meals, or sleep on his mattress on the floor for less than two full days [does not] rise[] to the level of severity necessary to state a constitutional violation" *(citing Bell,* 441 U.S. at 534)); *see also Collins v. Ainsworth,* 382 F.3d 529, 545 (5th Cir. 2004) (concluding denial of mattress for 24 hours did not amount to punishment). Accordingly, Shanklin's confinement to the interview room did not constitute punishment, and Shanklin's Due Process claim must fail. The Court will GRANT Defendants' Motion for Summary Judgment as to Count Four (B). Count Four (B) will be DISMISSED.

### E.    Count Five:  Breach of Duty to Protect

Count Five alleges Defendants failed to protect Shanklin "from the continued battery and assault both physical and verbal from all named defendants," failed to adjust Shanklin's hand and leg restraints, and failed to permit Shanklin to leave the interrogation room.  (Compl. ¶¶ 153-54.) Because Shanklin fails to demonstrate that he was subjected to any unconstitutional force, Count Five cannot survive summary judgment.

"The affirmative duty to protect arises not from the State's knowledge of the individual's predicament . . . but from the limitation which it has imposed on his freedom to act on his own behalf."  *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989).  Thus, an affirmative duty to act arises from a custodial relationship.  *Id.*; *Doe v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 174-75 (4th Cir. 2010); *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir. 1995); *see also Piechowicz v. United States*, 885 F.2d 1207, 1215 (4th Cir. 1989) (holding that "Fifth Amendment substantive due process protects the liberty interests only of persons affirmatively restrained by the United States from acting on their own behalf").

Defendants concede that because an officer had arrested Shanklin and he was not free to leave the police station, Defendants bore an affirmative duty to protect him at the hands of other officers.  (Defs.' Mem. 24.)  Viewing the facts favorably to Shanklin, Defendants arguably used some measure of force against Shanklin:  (1) when Snyder spit in Shanklin's face; (2) when Snyder struck Shanklin with his notepad; (3) when Snyder pulled Shanklin out of the police car; and, (4) when Defendants placed Shanklin in leg restraints and handcuffs.  Nevertheless, because Shanklin fails to demonstrate that any Defendant used excessive force against his person, his claim for failure to protect him from violence fails.

50

Under the binding Fourth Circuit precedent, "[t]o succeed on an excessive force claim under the Due Process Clause of the Fourteenth Amendment, [a plaintiff] must show that [the defendant] 'inflicted unnecessary and wanton pain and suffering.'" *Orem*, 523 F.3d at 446 (*quoting Taylor v. McDuffie,* 155 F.3d 479, 483 (4th Cir. 1998)).[53] To determine whether the amount of force employed was so excessive as to amount to unconstitutional punishment a court must ultimately determine "whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 446 (*citing Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973)). In determining whether prison officials have acted maliciously and sadistically, a court should balance: (i) "'the need for the application of force,'" (ii) "'the relationship between the need and the amount of force that was used,'" (iii) the threat reasonably perceived by the responsible officials, and (iv) any efforts made to temper the severity of a forceful response. *Whitley v. Albers*, 475 U.S. 312, 321 (1986) (*quoting Johnson*, 481 F.2d at 1033).

The absence of serious injury is also a relevant, but not dispositive, factor to be considered in the excessive force analysis. *Wilkins*, 130 S. Ct. at 1178-79. "An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Id.* at 1178 (internal quotations omitted). "Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts." *Id.* Thus, "the 'core judicial inquiry'" is not "the extent of the injury," but "the nature of the force-

---

[53] In *Wilkins v. Gaddy*, 130 S. Ct. 1175, 1179 (2010), the Supreme Court abrogated the aspect of *Taylor* that required a plaintiff must come forward with more than a *de minimis* injury to prevail on an excessive force claim.

specifically, whether it was nontrivial and 'was applied . . . maliciously and sadistically to cause harm.'" *Id.* at 1179 (*quoting Hudson v. McMillian,* 503 U.S. 1, 7 (1992)) (alteration in original).

### 1. Snyder's Conduct Did Not Amount to Excessive Force

The allegations as to Snyder's single incident of spitting, while certainly deplorable and offensive, do not rise to the level of a constitutional violation. *See DeMallory v. Cullen,* 855 F.2d 442, 444 (7th Cir. 1988); *see also Gill v. Tuttle,* 93 F. App'x. 301, 303 (2d Cir. 2004) (No. 03-0014) (finding that prison guard spitting on prisoner was *de minimis* use of force and did not violate Eighth Amendment), *available at* 2004 WL 605281, at *2; *Owens v. S.C. Dep't of Corr.,* No. 8:09cv00278, 2009 WL 4807005, at *5 (D.S.C. Dec. 8, 2009). Similarly, Shanklin has failed to introduce evidence from which a jury could conclude that Snyder's alleged striking him with a notepad amounted to more than a "nontrivial" use of force. *Wilkins,* 130 S. Ct. at 1179; *see Jones v. Walker,* No. 3:06cv00702, 2007 WL 3333250, at *2 (S.D. Ill. Nov. 9, 2007) (summarily dismissing inmate's complaint where guard struck him in the face with a snowball).

While allegedly Snyder employed some force in pulling Shanklin from the car, Shanklin fails to establish such force was excessive. In light of Shanklin's leg and hand restraints, Snyder needed to use some force to remove Shanklin from the car. *See Orem,* 523 F.3d at 446 (discussing relevant factors in evaluating a claim of excessive force) (*citing Johnson,* 481 F.2d at 1033)). Snyder was careless in his efforts to pull Shanklin from the car, thus causing Shanklin to twice strike his head on interior of the car.[54] Shanklin's evidence does not suggest that Snyder was pulling inordinately hard with the intent of causing Shanklin to strike the car. *Id.* (*citing*

---

[54] The record also suggests that Snyder was highly agitated with Shanklin for Shanklin's failure to lead the police to Davion.

*Johnson*, 481 F.2d at 1033). Rather, even by Shanklin's account, this contact occurred not

because Snyder wished to cause Shanklin harm, but because he was "attempting to yank plaintiff

from [the] car." (Compl. ¶ 70.) Moreover, at best the record indicates that Shanklin experienced

a brief moment of "sharp pain" and a "feeling like he . . . blacked out for a second." (Compl.

¶ 70.) Accordingly, viewed in the light most favorable to Shanklin, the evidence demonstrates

that Snyder exercised a lack of due care in removing Shanklin from the vehicle. Such a showing

is insufficient to support a due process claim for excessive use of force.

### 2. The Use of Hand and Leg Restraints Did Not Constitute Force

Shanklin also contends the use of hand and leg restraints amounted to an excessive use of

force. As recited above, other than brief trips to the bathroom, no evidence exists that

Defendants placed any restraints on Shanklin until about 12:30 a.m. on July 15, 2005. (Snyder

Decl. ¶ 5; Compl. ¶¶ 53, 55.) At that time, Snyder placed handcuffs and leg shackles on

Shanklin in preparation for driving Shanklin to look for Davion's body. Upon returning to the

interview room, less than an hour later, Hatfield removed the leg restraints, but left Shanklin in

handcuffs. (Hatfield Decl. ¶ 8.) It is certainly a reasonable use of force for police to use hand

and leg restraints when holding or moving an individual suspected of committing a serious crime

outside of a secure detention facility. *See Brown*, 278 F.3d at 368 (noting that "a standard

procedure such as handcuffing would rarely constitute excessive force where the officers were

justified . . . in effecting the underlying arrest"); *Haslar v. Megerman*, 104 F.3d 178, 180 (8th

Cir. 1997) (concluding "[i]t is eminently reasonable to prevent escape attempts" to shackle

pretrial detainees when they are outside the secure detention facility); *Crump v. Soloman*,

53

No. 5:07ct03129, 2010 WL 2104178, at *(E.D.N.C. May 20, 2010) (concluding confining inmate in full restraints for 13 hours, while transporting inmate, did not constitute excessive force).

Furthermore, Defendants had good reason to maintain Shanklin in the interview room: namely, the need to obtain from Shanklin information about Davion's location. From the time Shanklin was initially placed in restraints, until Davion's body was found after 12:30 p.m., the police were still conducting a search and rescue mission in an attempt to find the four-year old child, who they believed was in desperate need of medical care. (Seals. Decl. ¶¶ 1, 2.)[55]

Nevertheless, according to Shanklin, Defendants used more force than was actually necessary in that the restraints were too tight. Although Defendants did not temper their use of force in that they repeatedly ignored Shanklin's requests to loosen the handcuffs and leg restraints, Hatfield did remove the leg restraints when Shanklin returned to the interview room after his first car ride. The record the Court must consider suggests that Defendants' comments and conduct reflect little sympathy for Shanklin and his many complaints of discomfort, but Shanklin fails to come forward with any evidence that he sustained anything more than temporary minor discomfort. While not dispositive, this fact supports Defendants' assertions that the force employed was trivial rather than excessive. *See Wilkins*, 130 S. Ct. at 1178-79. Additionally, conspicuously absent is any evidence that Shanklin complained about his restraints to his attorney when he saw him around 9:00 a.m. on July 15, 2005, or that he continued to

---

[55] Again, Shanklin's untimely submissions, if considered by the Court, would not help Shanklin's claim. In the transcript attached to Shanklin's belated Memorandum in Opposition to Summary Judgment, Seals indicated that, in his 24 years of experience, this was "one of the most extensive search and rescue missions that we've ever put together." (Trial Tr. 351:11-13, 353:16-18.)

complain about the restraints after he led the police to Davion's body and was returned to the interview room.[56]

Although Shanklin has demonstrated the use of restraints was uncomfortable, Shanklin has failed to adduce evidence from which a reasonable juror could conclude that Defendants' use of restraints subjected him to "unnecessary and wanton pain and suffering." *Orem*, 523 F.3d at 446 (*quoting Taylor*, 155 F.3d at 483). Accordingly, the Court will GRANT Defendants' Motion for Summary Judgment as to Count Five. Count Five will be DISMISSED.

### F.    Count Nine:  Retaliatory Treatment

#### 1.    Count Nine (A):  Physical Restraint as Retaliation

In Count Nine (A), Shanklin contends that Defendants "started to intimidate, harass and torture plaintiff by confining plaintiff in a small crowded poor [sic] ventilated windowless interrogation room restrained at the wrists and ankles for hours, depriving plaintiff of sleep physically and verbally keeping plaintiff awake." (Compl. ¶ 159.) Shanklin alleges these acts constitute "intentional [r]etaliation against plaintiff" for his failure to cooperate with Defendants. (Compl. ¶ 159.)

As the Court explained with respect to Counts One (B) and Four (B), because Defendants held Shanklin as a pretrial detainee, Shanklin must show that Defendants' conduct reflected an intent to punish him. *See Bell*, 441 U.S. at 538-39. No evidence before the Court suggests that Defendants used physical restraints on Shanklin as a means of retaliation for his failure to

---

[56] Indeed, the documents submitted in Shanklin's belated opposition to the motion for summary judgment (which this Court does not consider) indicate that his restraints were not causing him any significant distress. As noted above, at 3:10 p.m., Shanklin was "asked if he desired anything," and he responded "NO." (Interview Activity Log (capitalization corrected).)

cooperate. As the Court found previously, Defendants' use of restraints was rationally related to a legitimate governmental purpose and did not evince an intent to punish. Accordingly, the Court will GRANT Defendants' Motion for Summary Judgment as to Count Nine (A). Count Nine (A) will be DISMISSED.

### 2.    Count Nine (B):  Verbal Threats Regarding Shanklin's Mother

Shanklin alleges Defendants Price, Snyder, Hatfield, Seals, and Beaver "all continually made mention of plaintiff's mother in a [sic] intimidating and assaulting way attempting to force plaintiff to comply to [sic] defendants [sic] demands," in violation of Shanklin's constitutional rights. (Compl. ¶ 159.) This claim cannot survive summary judgment.

This Court has held that "[v]erbal harassment and abuse by arresting officers, without more, does not rise to the level of a constitutional claim under § 1983." *Williams v. DeAngelis*, No. 1:07CV824, 2008 WL 3992634, at *7 (E.D. Va. Aug. 28, 2008). "Only when a verbal threat is combined with action apparently designed to carry out the threat can it constitute a claim of constitutional dimension." *Id. (citing Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978)). Shanklin fails to adduce evidence that indicates Defendants evinced any action to use physical violence against either him or his mother. Rather, the record reflects that Defendants' threats were directed at potentially prosecuting Shanklin and his mother for murder charges in connection with Davion's disappearance.[57] Therefore, even if Defendants had made some verbal threat to send Shanklin's mother to jail, that threat alone cannot constitute a constitutional

---

[57] Shanklin has not come forward with evidence which would demonstrate that Defendants lacked probable cause to charge his mother in connection with Davion's disappearance. *Cf. Johnson v. Trigg*, 28 F.3d 639, 644 (7th Cir. 1994) (concluding that a promise to release the suspect's mother from custody if he confesses does not make his statement involuntary if the police have good ground for holding the mother).

violation. *See Williams*, 2008 WL 3992634, at \*7. Accordingly, the Court will GRANT Defendants' Motion for Summary Judgment as to Count Nine (B). Count Nine (B) will be DISMISSED.

## VII. Conclusion

For the foregoing reasons, Shanklin's First Rule 56(f) Motion will be DENIED. (Docket No. 110.) Shanklin's Second Rule 56(f) Motion will be DENIED. (Docket No. 126.) Shanklin's Motion for Leave to File Belated Response will be DENIED. (Docket No. 132.) Defendants' Motion for Summary Judgment will be GRANTED. (Docket No. 83.) The Complaint will be DISMISSED WITH PREJUDICE.

In addition, because the Court will grant Defendants' Motion for Summary Judgment, Shanklin's Motion to Subpoena Names and Time Log Sheets (Docket No. 104) will be DENIED AS MOOT; Shanklin's Motion for Subpoena to Examine the Police Officer's [sic] Personnel File[s] and Tangible Things (Docket No. 106) will be DENIED AS MOOT; Shanklin's Motion for an Order Compelling Discovery (Docket No. 122) will be DENIED AS MOOT; and Defendants' Motion [for] Leave to Call More Than Four (4) Witnesses at Any Trial of This Matter (Docket No. 118) will be DENIED AS MOOT.

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States Magistrate Judge

Richmond, Virginia
Date: July 27, 2010